**INTELEX SYSTEMS, INC.**

v.

**UNITED STATES.**

C.D. 4093; Protest No. 66/40037–7880–65.

United States Customs Court,
Third Division.

Oct. 19, 1970.

---

1. 62 P.S. § 401.

2. 45 C.F.R. § 233.20(a) (3) (vi) (a), (ix).

4. 42 U.S.C.A. § 601 et seq.

Barnes, Richardson & Colburn, New York City (E. Thomas Honey, New York City, of counsel), for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (Morris Braverman, New York City, trial attorney), for defendant.

Before RICHARDSON, LANDIS, and ROSENSTEIN, Judges.

LANDIS, Judge:

Plaintiff seeks to recover a portion of the duties assessed at New York on the value of sixty-one reels of telephone cable produced in Spain in part from copper wire and insulating paper exported from the United States.

The telephone cable was liquidated and assessed at 15 per centum ad valorem of its appraised and entered value, as invoiced, under paragraph 316(a) of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade (T.D. 54108), plus 1.7 cents per pound on the copper content, pursuant to section 4541(1) of the Internal Revenue Code.

Paragraph 316(a), as modified, provides, *inter alia,* for telephone cable. Plaintiff does not dispute the specific duty assessed or the applicable 15 per centum duty rate under paragraph 316 (a). It here limits the protest to claim that the telephone cable should have been liquidated under paragraph 1615(g) (2) of the Tariff Act of 1930, and duty assessed under paragraph 316(a) at 15 per centum of the value attributable to the processing of the copper wire outside the United States incident to making the telephone cable. Paragraph 1615(g) (2) provides as follows:

(2) If—

(A) any article of metal (except precious metal) manufactured in the United States or subjected to a process of manufacture in the United States is exported for further processing; and

(B) the exported article as processed outside the United States, or the article which results from the processing outside the United States, as the case may be, is returned to the United States for further processing.

then such article may be returned upon the payment of a duty upon the value of such processing outside the United States at the rate or rates which would apply to such article itself if it were not within the purview of this subparagraph (g).

Defendant concedes that in the context of paragraph 1615(g) (2), *supra,* the article of metal exported for further processing was copper wire manufactured in the United States and that the article which resulted from processing the copper wire outside the United States was telephone cable. (R. 14.) For reasons we next discuss, we find that the imported telephone cable is not within the purview of paragraph 1615(g) (2) and overrule the protest.

The record includes a sample of paper insulated lead covered telephone cable (exhibit 1), illustrative but not the same as the imported telephone cable; a sample of 22-gauge copper wire, paper insulated (exhibit 2) illustrative but not the same as the copper wire exported, and a Bureau opinion ruling, dated September 21, 1956, on the dutiable status of copper wire and bars manufactured in the United States, sent abroad for further processing into telephone cable when the telephone cable was returned to the United States (exhibit 3).

Mr. Peter F. Rodriguez, an employee of I.T.T. Export Corporation, a subsidiary of International Telephone and Telegraph Company, testified on trial. He stated that in August 1958, the month and year the telephone cable of this protest was imported, he was employed by Intelex Systems, Inc., the importer of record and a subsidiary, also, of International Telephone and Telegraph Company. Mr. Rodriguez testified that Intelex Systems purchased the exported copper wire from Phelps Dodge, Bayway, New Jersey. The exported insulated paper was purchased from J. A. Manning Company, Troy, New York. (R. 7.) Intelex Systems exported the copper wire and insulating paper to Standard Elec-

trica S. A., Madrid, Spain, to be processed or manufactured into lead covered telephone cable for installation at the Vandenburg Air Force Base, Lompor, California. He further stated that Gustav Hirsh Organization, contractors, had contracted to do some work "[r]elating to communications equipment and part of this equipment consisted of telephone cable." (R. 8) Gustav Hirsh Organization, according to Mr. Rodriguez, approached Intelex Systems "to tender a quotation on that portion of the Air Force contract which covered telephone cable." (R. 8) The telephone cable returned to the United States in this case was delivered to the Gustav Hirsh Organization for the Air Force job. What the Gustav Hirsh Organization did with the telephone cable is described in the testimony of Mr. Rodriguez, under cross-examination, as follows:

Q. Mr. Rodriguez, would you describe in detail the actual process in the United States to which the merchandise was subjected?—A. The one on the entry?

Q. That's correct.—A. How fine detail do you want me to go into? There might be certain details that just can't come to my mind.

Q. Well, you testified that you knew the processing.—A. I know the processing, correct.

Q. All right.—A. Start off with certain pair sizes where the cable is either strung from pole to pole or is put in ducts underground.

Q. Are you describing the process applied to this merchandise before it's used or—A. You have to determine, according to the pair size and weight of this cable, what you intend to do with it.

Q. What was intended to do with this?—A. In this particular case, all cables from 101 up to 404 were placed in ducts since this cable was being installed at the Vandenburg Air Force Base, had to go underground, with the

exception of 26 pairs, which was strung from pole to pole.

Q. 26 pairs were thrown from pole to pole?—A. No, strung.

Q. Strung, by whom?—A. By Gustav Hirsh.

Q. In the installation process at Vandenburg Air Force Base?—A. Yes.

Q. Was that during the installation process?—A. I don't quite get your question. What do you mean by "the installation process?"

Q. When you say strung from pole to pole, is that installing the cable for its ultimate use?—A. You are placing. You haven't done any further processing at that particular point.—A. From that point, from the pole to pole, the cable is taken off a take-off reel and it's strung from pole to pole. It gets to the point where the sheathing is removed from the cable, it's peeled back a couple of feet, they remove the insulation, leaving sufficient insulation to identify the color code of the cable itself. The splicer proceeds, starts to splice every individual conductor. When he completes this operation, he has to seal these conductors by placing insulating paper, rubber tape, or any other insulating material that he might be required to insulate it. When he is finished with his insulation he puts a lead sheathing or sleeve, soldering both ends to make certain that the cable does not allow any moisture inside. He injects gas, he maintains a certain amount of gas pressure in that cable to determine if there is any leak in the sheathing where moisture could seep through.

Q. You are talking about that which was strung from pole to pole?—A. Same thing would have to apply when you bury the cable in the ground, in ducts.

Q. All right, now, my question is this: When this is being done to the

cable, is that during the installation of the cable for its ultimate use?—A. Yes.

Q. This is done right on the job site?—A. Absolutely. [R. 25–28.]

Plaintiff contends that, as testified to by Mr. Rodriguez, the telephone cable was returned to the United States for the same further processing followed in connection with all telephone cable, namely, cutting the cable to required lengths; pulling the lead sheathing back a couple of feet for splicing purposes; splicing the wires to existing circuits; joining the conductors, and covering them with a lead sleeve to provide a strong and moisture proof seal. (R. 31, 32.)

 Tariff statutes and tariff terms, as is well known, are directed to the trade and commerce of the United States, Swift & Co., a Corporation v. United States, 27 CCPA 181, 185, C.A.D. 83 (1939). The term "processing" in the tariff sense, as plaintiff cites, generally connotes an advancement of the material or the article, Liberty Lace & Netting Works v. United States, 15 Cust.Ct. 180, C.D. 968 (1945). It is also well known, and the cases have recognized the fact, that a material may be subjected to several manufacturing processes, each advancing it, cf. A. F. Burstrom v. United States, 36 Cust.Ct. 46, C.D. 1752 (1956), affirmed Id. v. Id., 44 CCPA 27, C.A.D. 631 (1956), before the material or article takes on the form of a completed article. Ford Motor Co. v. United States, 19 CCPA 69, 71, T.D. 44897 (1931).

 Congress, in the Customs Simplification Act of 1954 (T.D. 53599), added paragraph 1615(g) (2) in order to permit *"manufacturers* of metal articles processed in the United States to export them for further processing abroad, without payment of duty on re-importation, except on the cost of the processing", A. F. Burstrom v. United States, *supra* (36 Cust.Ct., at page 501). The 1954 amendment used the "expression 'subjected to a process of manufacture' as synonymous with 'processing' ". A. F. Burstrom v. United States, *supra* (44 CCPA, at page 31).

 The facts unveiled in this record reveal that Intelex Systems processed nothing in connection with the telephone cable. It purchased the copper wire from a manufacturer in New Jersey. Whether Intelex Systems is the viable manufacturer Congress intended to benefit when it added paragraph 1615(g) (2), namely, *manufacturers* of metal articles processed in the United States, A. F. Burstrom v. United States, *supra,* we need not decide. For we are of the opinion that the article, telephone cable, resulting from the processing of the copper wire abroad, was not returned to the United States for further processing within the meaning of paragraph 1615 (g) (2). We read paragraph 1615(g) (2) to mean returned to the United States for further processing necessary to get a completed article, in the common and commercial sense, not processes to which one may subject a completed article incident to using it for the purpose intended. Processes incident to getting a completed article, and processes incident to using the completed article for the purpose intended, are vastly different concepts in both commercial and common understanding. Numerous commercially completed articles, cake mixes and dehydrated products to mention a few, have to be further processed when they are used as intended. The telephone cable imported in this case was a completed article of commerce. Gustav Hirsh Organization did not put the imported telephone cable through further manufacturing processes, it merely prepared or processed the connecting ends of the telephone cable incident to using the cable for the purpose intended.

The factual situation here has the same overtones as that to which the court of appeals addressed itself in construing connected paragraph 1615(g) (1) when it said:

\* \* \* Broadly, it may be said, as seems to have been held by the trial

court, that the term "alterations" of articles means any manufacturing process to which articles may be subjected. We are of opinion, however, that the Congress did not intend by the term "alterations" in paragraph 1615 (g), *supra,* to mean that uncompleted articles, such as those here involved, manufactured in the United States or imported into the United States, could be exported to a foreign country and there manufactured into completed articles such as those at bar, and when returned to the United States, be subject only to duties on the so-called "alterations" provided for in paragraph 1615(g) (2), conveys the sense ed States v. J. D. Richardson Company, 36 CCPA 15, 17, C.A.D. 390 (1948).]

The term "returned to the United States for further processing", in paragraphs 1615(g) (2), conveys the sense that the article processed abroad and returned to the United States is no more than an advanced material or article which will be subjected to further manufacturing processes in the United States to get a completed article.

For the reasons stated, the protest is overruled. Judgment will be entered accordingly.