59 CCPA

**INTELEX SYSTEMS, INC., Appellant,**

**v.**

**The UNITED STATES, Appellee.**

**Customs Appeal No. 5443.**

United States Court of Customs and Patent Appeals.

June 8, 1972.

Barnes, Richardson & Colburn, New York City, attorneys of record, for ap-

pellant. E. Thomas Honey, Irving Levine, New York City, of counsel.

L. Patrick Gray, III, Asst. Atty. Gen., Andrew P. Vance, Chief Customs Section, Jordan J. Fiske, New York City, for the United States.

Before RICH, ALMOND, BALDWIN and LANE, Judges, and RE, Judge, United States Customs Court, sitting by designation.

RE, Judge.

This appeal is from the decision and judgment of the Customs Court [1] overruling the importer's protest to the classification and liquidation of certain reels of telephone cable under paragraph 316 (a) of the Tariff Act of 1930. The cable was produced in Spain in part from copper wire and insulating paper exported from the United States. Duty was assessed at 15% ad valorem plus, pursuant to section 4541(1) of the Internal Revenue Code, 1.7 cents per pound on the copper content. The importer contends that the goods should be liquidated under paragraph 1615(g) (2) of the 1930 Act, and duty assessed on the *value* of processing performed outside the United States at the telephone cable rate provided by ¶ 316(a). We affirm.

The statutory provisions read in pertinent part:

Paragraph 316(a), Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108:

Telegraph, telephone, and other wires and cables composed of iron, steel, or other metal (except gold, silver, platinum, tungsten, or molybdenum), covered with or composed in part of cotton, jute, silk, enamel, lacquer, rubber, paper, compound, or other material, with or without metal covering.    15% ad val.

Paragraph 1615(g) (2), Tariff Act of 1930, as amended:

(2) If—

(A) any article of metal (except precious metal) manufactured in the United States or subjected to a process of manufacture in the United States is exported for further processing; and

(B) the exported article as processed outside the United States, or the article which results from the processing outside the United States, as the case may be, is returned to the United States for further processing,

then such article may be returned upon the payment of a duty upon the value of such processing outside the United States at the rate or rates which would apply to such article itself if it were not within the purview of this subparagraph (g).

The issue is whether the imported telephone cable was "returned to the United States *for further processing*" (emphasis supplied) within the meaning of ¶ 1615(g) (2) (B).

The record shows that copper wire and insulating paper, each manufactured in the United States, were purchased by the importer and exported to Spain where certain manufacturing or processing operations were performed resulting in lead-covered telephone cable. That telephone cable was then imported into the United States on cable rolls, and supplied to a contractor who was installing communications equipment for the United States Air Force at the Vandenburg Air Force Base in Lompor, California. At the installation site, pursuant to using it in underground ducts or as an overhead line, certain steps were taken concerning which appellant's witness testified as follows:

\* \* \* From that point, from the pole to pole, the cable is taken off a take-off reel and it's strung from pole to pole. It gets to the point where the [lead] sheathing is removed from the cable, it's peeled back a couple of feet, they remove the insulation, leaving sufficient insulation to identify the color

---

1. 65 Cust.Ct. 306, C.D. 4093, 318 F.Supp. 515 (1970).

code of the cable itself. The splicer proceeds, starts to splice every individual conductor. When he completes this operation, he has to seal these conductors by placing insulating paper, rubber tape, or any other insulating material that he might be required to insulate it. When he is finished with his insulation, he puts a lead sheathing or sleeve, soldering both ends to make certain that the cable does not allow any moisture inside. He injects gas, he maintains a certain amount of gas pressure in that cable to determine if there is any leak in the sheathing where moisture could seep through.

Q. You are talking about that which was strung from pole to pole? A. Same thing would have to apply when you bury the cable in the ground, in ducts.

Q. All right, now, my question is this: When this is being done to the cable, is that during the installation of the cable for its ultimate use? A. Yes.

Q. This is done right on the job site? A. Absolutely.

Appellant maintains that any one or all of the above-enumerated steps conducted at the installation site constitute "further processing" in the United States within the purview of ¶ 1615(g) (2) (B), as amended.

The Customs Court did not agree with appellant, nor do we. In particular, the court found the expression "returned to the United States for further processing" in ¶ 1615(g) (2) (B) to convey the sense "that the article processed abroad and returned to the United States is no more than an advanced material or article which will be subjected to further *manufacturing* processes in the United States to get a completed article." (Emphasis supplied.) It regarded the imported telephone cable in this case to be a completed article of commerce, and noted that the communications equipment installer and contractor in California "did not put the imported telephone cable through further manufacturing processes" but "merely prepared or processed

the connecting ends of the telephone cable incident to using the cable for the purpose intended."

We have considered the numerous cases cited by the importer and the Government which have interpreted the words "process" or "processing." While those interpretations are helpful in a general sense, we are not really concerned with the meaning of "processing" in a vacuum, in the abstract, or in other contexts unrelated to those at bar. Rather, its meaning must be controlled by the particular context in which it is used here and the legislative intent. Fleming v. Hawkeye Pearl Button Co., 113 F. 2d 52, 57 (8th Cir. 1940). When we look to the context of ¶ 1615(g) (2), we do not think that Congress had in mind that any and all kinds of "processing" taking place upon return of an article to the United States would suffice to bring the article within the purview of that paragraph. Instead, we believe that the words "further processing" relate to the kind of processing to which the article had been subjected before—namely, "a process of manufacture," as expressed in ¶ 1615(g) (2) (A). We continue of the view that Congress used "the expression 'subjected to a process of manufacture' as synonymous with 'processing' ", Burstrom v. United States, 44 CCPA 27, CAD 631 (1956), and that the "further processing" referred to in ¶ 1615(g) (2) is a further manufacturing process.

The question remains whether the steps performed on the imported telephone cable at the installation site by the installing contractor, as outlined earlier in this opinion, are further processing amounting to a manufacturing process. Like the Customs Court, we do not think that processes to which an already *completed* article is subjected, incident to using it for the purpose intended, are necessarily part and parcel of manufacturing processes performed on *that* article. The importer's record is devoid of evidence that the operations performed on the imported telephone cable at the installation site by the installation contractor would be regarded as a process of

manufacture of that cable in any common or commercial sense. We are not persuaded that the importer has satisfied its burden of proving the claimed classification erroneous, and its own correct.

The judgment is affirmed.

Affirmed.