**SIGMA INSTRUMENTS, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 79–11–01625.**

United States Court of
International Trade.

March 18, 1983.

Stein, Shostak, Shostak & O'Hara, Los Angeles, Cal. (S. Richard Shostak and John Politis, Los Angeles, Cal., at the trial, S. Richard Shostak, Los Angeles, Cal., on the brief), for plaintiff.

J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Commercial Litigation Branch, New York City (Saul Davis, New York City, at the trial and on the brief), for defendant.

NEWMAN, Judge:

### Introduction

This action concerns the applicability of item 807.00 of the Tariff Schedules of the United States (TSUS) to certain terminal pins (terminals) of American origin.[1] The terminals were shipped to Mexico, and there incorporated into plaintiff's AK 52–1 and AK 52–3 header assemblies (headers) and series 67 relays, which headers and relays were exported to the United States. Upon liquidation of the entry at the port of San Ysidro, California, duty was assessed (by Customs at San Diego) upon the full appraised value of the headers and relays at the rate of 8.5% ad valorem under the provision in item 685.90, TSUS, for electrical relays and parts thereof. Plaintiff does not dispute the classification or rate of duty under item 685.90, but rather, challenges the refusal by Customs to make a duty allowance for the cost or value of the terminals pursuant to item 807.00, TSUS.[2]

### Statute Involved

Item 807.00, TSUS, as amended, reads:

Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting ........................A duty upon the full value of the imported article, less the cost or value of such products of the United States (see headnote 3 of this subpart)

### Parties' Contentions

Plaintiff claims that the subject terminals met all the requirements of item 807.00, TSUS, and therefore should have been

1. The involved terminals are of two types or configurations: NC 178–1 solder terminals, that have a hole for a solder connection; and NC 178–3 terminals, which plug into a socket.

2. The parties have stipulated: the terminals in dispute were of American origin; their cost or value was .0046 dollars each; and item 807.00 treatment was accorded to all components of the imported relays except with respect to the molding compound, terminals and lead frames (Tr. 3–4).

granted the duty allowance prescribed by the statute.

Defendant, on the other hand, insists that the terminals were properly denied item 807.00 treatment because they were not exported ready for assembly without further fabrication; and alternatively, because the terminals were advanced in value or improved in condition other than by assembly or operations incidental to the assembly process.

I have concluded that plaintiff's claim should be sustained.

### The Record [3]

The pertinent facts are:

The terminals in question were manufactured in Braintree, Massachusetts. There, the terminals were stamped out of a hardened material, deburred, tin-plated and shipped in bulk to Sigma de Mexico, S.A., Tijuana. In Mexico, the terminals were first incorporated into headers by a transfer molding operation, and subsequently became components of plaintiff's relays.

In the transfer molding operation, a molding compound, "Glasskyd", shipped to Mexico in rope form, is cut to the proper length and weight. The terminals are placed into holding fixtures which maintain the desired configuration of the terminals and their proper spacing. After the terminals are positioned in holding fixtures, the fixtures are placed in the molding machine upside down while the terminals are lined up with slots in the lower half of the mold. When the terminals in the loading fixtures are properly aligned with the holes and slots in the lower half of the mold, the terminals are released from the loading fixtures to stand upright in the cavity of the mold. The molding material enters the lower half of the mold where the transfer molding operation occurs. When the molding press is activated, the upper portion of the press comes down and the molding compound is heated, becoming a viscous material. A transfer rod applies pressure to the molding compound and forces the molding compound into the cavities of the mold. Thereupon, the upper portion of the molding press is retracted; the molding compound quickly hardens to the shape and dimensions of the mold cavity; and the headers are then broken away from the runners of the eight cavity mold. The headers (incorporating the terminals with the desired configuration and spacing) are then cleaned and deflashed.

A finished header comprising 15 components (14 terminals and a solidified plastic base) serves to permanently fix the terminals in their designed configuration and spacing to perform their intended function in plaintiff's relay assemblies. In the process of creating the relays, the terminals were bent, contacts were staked to some of them, certain terminals had wires connected to them, and there were some additional assembly operations.

There is no dispute concerning the additional operations in Mexico subsequent to the transfer molding operation (Tr. 37).

### Opinion

Under item 807.00, TSUS (the governing statutory provision) imported articles assembled in foreign countries with fabricated components that have been manufactured in the United States are subject to duty upon the full value of the imported product less the value of the United States fabricated components contained therein. Under item 807.00, the duty exemption is limited to those fabricated components—the product of the United States—which:

---

**3.** My learned colleague, the Honorable Scovel Richardson, presided at the trial of this action in Los Angeles, California. After his untimely death, the case was reassigned to me for decision.

At the trial, one witness was called by plaintiff, Mr. Edward Bial, general manager of Sigma de Mexico; and one witness testified for defendant, Dr. Sander B. Friedman, professor of manufacturing engineering at Miami University, Oxford, Ohio, and of industrial manufacturing engineering at California Polytechnic Institute in Pomona, California. The parties submitted various exhibits, representative of the terminals in issue and illustrative of the operations performed in Mexico. The "Court papers" were received in evidence without marking (Tr. 11–12).

(a) were exported in condition ready for assembly without further fabrication;

(b) have not lost their physical identity by a change in form, shape or otherwise; and

(c) have not been advanced in value or improved in condition abroad, except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating and painting.

As previously mentioned, plaintiff claims special duty treatment under item 807.00 solely for the cost or value of the terminals. There is no dispute concerning requirement (b), *supra,* nor any controversy respecting the processes that occurred in Mexico following the transfer molding operation.

Central to the dispute is whether the transfer molding operation used in making the headers constitutes a permissible "assembly" under the statute, as claimed by plaintiff, or an impermissible fabrication, advancement in value, or improvement in condition, as asserted by defendant.

We first consider whether plaintiff has established that the terminals "were exported in condition ready for assembly without further fabrication", as specified by item 807.00(a), TSUS.

Defendant advances the argument that the transfer molding operation in Mexico represented a further fabrication, rather than an assembly, because at the time joinder of the terminals and molding compound initially occurred, the compound was in a liquid state. Thus, reasons defendant, under item 807.00 there can be no assembly of a solid and liquid. Further, defendant posits that the terminals were substantially transformed into new and different articles of commerce by the molding process, with a new and different character, name or use, viz., a header.

Plaintiff contends that the transfer molding operation constituted an assembly of solids (viz., the terminals and plastic base of the headers), citing *C.J. Tower & Sons of Buffalo, Inc. v. United States,* 62 Cust.Ct. 643, C.D. 3840, 304 F.Supp. 1187 (1969), as dispositive of the issue.

In *Tower,* certain plastic film imported from Canada was claimed by plaintiff to be entitled to item 807.00 treatment for a fabricated component of United States manufacture. The imported film consisted of two plastic sheets, one of which was a polyester ("mylar") of United States manufacture, and the other was a polyethylene of Canadian manufacture. The mylar was exported to Canada where it was used in an extrusion process that initially extruded molten polyethylene, which as it solidified was then joined together with the polyester sheet and held together by means of an adhesive or adhesion promoter. Significantly, defendant argued in *Tower,* as here, that there had been no "assembly" with respect to the imported merchandise since the Canadian polyethylene was initially in a molten form when it was joined to the American polyester film.

Judge Richardson, writing for the then Customs Court in *Tower,* held that there was an assembly of the polyester and polyethylene components within the purview of item 807.00, TSUS, as amended. After concluding from a study of lexicographic authorities and the Explanatory Notes to the Tariff Schedules respecting item 807.00 that the term "assembly" was used to describe the joining or coming together of solids, Judge Richardson stated as the linchpin of the Court's decision (62 Cust.Ct. at 647–48, 304 F.Supp. 1187):

It is true, of course, that in the initial stage of the process at bar the polyester is a solid and the polyethylene is a liquid. Nevertheless, the process described in the testimony of the witness Bolton is a controlled operation which anticipates the transformation of the liquid into a solid before completion of the process, and provides in advance for the adhesion of two solids together in the final product. The adhesion phase of the operation to which the polyester is subjected assures permanence of "assembly" of the polyester with the polyethylene. So that, while there is no "assembly" of the involved materials at the commencement of the operation, there is, in our opinion, an "assembly" of

such materials upon completion of the process.

\*   \*   \*   \*   \*   \*

It seems clear * * * that the involved process is nothing more or less than a combination of manufacturing and assembling processes. And we do not find any language in item 807.00 which would rule out a combination of "manufacturing" processes as to the foreign material with the "assembly" processes covered by the statute.

While *Tower* holds that an "assembly" for purposes of item 807.00 involves the joining or coming together of solids,[4] the rationale in *Tower* is persuasive that the transfer molding operation here should be regarded as an assembly of solids for purposes of item 807.00. Importantly in *Tower*, as here, the Government urged disallowance of item 807.00 treatment for the American component because one of the components was initially in a molten form when joined or combined with the United States component. More, in both cases, while initially one of the components was in a transitory molten state, the processes were controlled operations that anticipated the rapid solidification or hardening of a plastic component before the completion of the joinder process and the permanent union of two solids. Finally, the transfer molding operation here is a combination of manufacturing and assembly processes, as was the extrusion process in *Tower*.

Defendant concedes that had the terminals been assembled with hardened (or solidified) molding compound utilizing preformed holes, the terminals would have been granted a duty exemption under item 807.00. However, it is important to note in the present case that at the completion of the transfer molding operation, the molding compound had substantially assumed a definitive solidification, size and shape, and permanently fixed the subject terminals into their designed configuration and spacing so that the resulting headers could perform their intended function in plaintiff's relays. Under all the facts and circumstances, and following *Tower*, I find that the transfer molding operation was an "assembly"[5] within the ambit of item 807.00, and hence Customs should have granted an allowance in duty for the terminals.

Defendant maintains that the decision in *Tower* was erroneous, and has called attention to *J.E. Bernard & Co. v. United States,* 57 CCPA 52, C.A.D. 975, 420 F.2d 1403 (1970) as a controlling precedent. I disagree.

*Bernard* concerned the classification of clock weights composed of metal in the shape of a pine cone with a wire loop or hook extending from the top. The clock weights were made by inserting a wire loop approximately a half inch into the top of a die or mold and then pouring in molten iron. After the metal solidified, the die was taken apart and the weight was removed and colored. The sole issue was whether the clock weights were classifiable as an assembly or subassembly within the purview of paragraph 368(c)(3) of the Tariff Act of 1930.

In addressing the issue of whether casting molten metal about a portion of a wire loop to form a clock weight results in an "assembly", the Appellate Court held that "the clear import of paragraph 368(c)(3) is that an assembly as specified therein results

---

**4.** The following decision cites this holding in *Tower* with approval: *United States v. Baylis Bros. Co.,* 59 CCPA 9, 11, C.A.D. 1026, 451 F.2d 643 (1971). And in accord, *E. Dillingham, Inc. v. United States,* 60 CCPA 39, 43, C.A.D. 1078, 470 F.2d 629 (1972). See also *Zwicker Knitting Mills v. United States,* 82 Cust.Ct. 34, 43, C.D. 4786, 469 F.Supp. 727 (1979), aff'd, 67 CCPA 37, C.A.D. 1240, 613 F.2d 295 (1980).

**5.** Since the headers were subsequently assembled with other components to form relays, the transfer molding operation essentially was a subassembly. However, an article is not precluded from an item 807.00 allowance merely because it was subjected to a subassembly process prior to assembly. *General Instrument Corp. v. United States,* 60 CCPA 178, C.A.D. 1106, 480 F.2d 1402 (1973). Of course, the subassembly process must itself be an assembly and not a further fabrication. *Zwicker Knitting Mills v. United States,* 82 Cust.Ct. 34, 46, C.D. 4786, 469 F.Supp. 727 (1979), aff'd, 67 CCPA 37, C.A.D. 1240, 613 F.2d 295 (1980).

when two or more existing parts or pieces are joined together but not when a part is formed by casting molten metal about a portion of a single preexisting part or piece."

In *Bernard,* the Court adverted briefly to the *Tower* decision, but pointed up that there the Customs Court had considered the word "assembled" in the *different context* of item 807.00. Fundamentally, of course, great caution must be exercised in relying upon the construction of a term in an entirely unrelated statute. As appropriately stressed by Judge Re,[6] writing for the then Court of Customs and Patent Appeals (now the Court of Appeals for the Federal Circuit) in *Intelex Systems, Inc. v. United States,* 59 CCPA 138, C.A.D. 1055, 460 F.2d 1083 (1972):

> We have considered the numerous cases cited by the importer and the Government which have interpreted the words "process" or "processing". While those interpretations are helpful in a general sense, we are not really concerned with the meaning of "processing" in a vacuum, in the abstract, or in other contexts unrelated to those at bar. *Rather, its meaning must be controlled by the particular context in which it is used here and the legislative intent.* * * * [Emphasis added.]

In view of the foregoing decision, I cannot accept *Bernard* as a controlling precedent in the instant case since in *Bernard* the Court did not construe item 807.00. *Tower,* on the other hand, construed the term "assembly" in the very context of item 807.00 and in connection with a factual setting that is strikingly analogous to that presented here. Moreover, for the meaning of the term "assembly" in item 807.00, the *Tower* holding has repeatedly been cited with approval. See cases cited in footnote 4, *supra,* and in Sturm, *Customs Law and Administration* (1980), at 619–620.

Defendant's reliance on *The Firestone Tire & Rubber Company v. United States,* 71 Cust.Ct. 63, C.D. 4474, 364 F.Supp. 1394

(1973), is misplaced, inasmuch as that case, like *Bernard,* involved a different statutory provision (item 806.30, TSUS), a different process (rubber coating of domes for premix soda syrup containers), and a different legal issue (whether the involved merchandise was subjected to "further processing").

Inasmuch as we have rejected defendant's primary position that the transfer molding operation constituted a further fabrication rather than an assembly, we turn to defendant's alternative argument predicated on item 807.00(c). Thus, defendant maintains that item 807.00 treatment of the terminals is precluded because they were advanced in value or improved in condition abroad by the transfer molding operation. I find defendant's alternative argument lacking in merit.

As aptly enunciated by Judge Rich in *Rudolph Miles v. United States,* 65 CCPA 32, C.A.D. 1202, 567 F.2d 979 (1978), "item 807.00 logically assumes that there *has been* an advancement or improvement, but limits the extent of the advancement in value or improvement in condition to that which is brought about solely by the *act of assembly* * * *". Simply put, an article advanced or improved solely as a result of assembly is not barred from the item 807.00 duty exemption. The fact that the headers are different articles from the terminals alone, results solely from an assembly of the terminals and the plastic component, and any resulting advancement in value is permitted by item 807.00.

Concluding, I find that the subject terminals were exported in condition ready for assembly without further fabrication, and were not advanced in value or improved in condition abroad, except by being assembled. As described above, admittedly there is no dispute that the terminals have not lost their physical identity by a change in form, shape or otherwise. Consequently, the cost or value of the terminals (.0046 dollars per unit, as stipulated by the parties) should be allowed as a deduction from

---

**6.** The Honorable Edward D. Re, Judge of the U.S. Customs Court (now Chief Judge, U.S. Court of International Trade), sitting by designation.

the full value of the imported headers and relays into which they were assembled pursuant to item 807.00, TSUS, as claimed by plaintiff.

Judgment will be entered accordingly.