**GENERAL INSTRUMENT COR-PORATION**

v.

**UNITED STATES.**

**C.D. 4216; Protests No. 69/32326–13177–69 and 69/32727–12479–69.**

United States Customs Court,
Third Division.
May 12, 1971.

William R. Shapiro, New York City, Lincoln & Stewart, Washington, D. C., associate counsel (Eugene L. Stewart, Washington, D. C., of counsel), for plaintiff.

L. Patrick Gray, III, Asst. Atty. Gen. (Robert Blanc, New York City, trial atty.), for defendant.

Before RICHARDSON and LANDIS, Judges.

RICHARDSON, Judge.

The merchandise of these two protests which were consolidated for trial consists of silvered mica, silvered mica plates, backing mica and tin foil of capacitors and gold wire of transistors under protest 69/32326, and tape, jumpers and leads of yokes, silvered mica, tin foil and backing mica of capacitors, and gold wire of transistors under protest 69/32727. The merchandise was exported from Taiwan, entered at the port of New York, and classified in liquidation under various provisions of the Tariff Schedules of the United States.

■ At the trial, held on January 20, 1970, claims under protest 69/32326 concerning the capacitors were formally abandoned by plaintiff pursuant to notice previously given by counsel. However, similar claims under protest 69/32727 concerning capacitors were not formally abandoned although notice of intention to abandon said claims had previously been given by plaintiff's counsel with respect to these claims also. Inasmuch as plaintiff's counsel did not present any evidence at the trial in support of plaintiff's claims as to the capacitors, we regard counsel's failure to for-mally abandon said claims as being a mere oversight, and accordingly, we deem the claims under protest 69/32727 as to capacitors as having been abandoned by plaintiff also.

■ With respect to the yokes covered by protest 69/32727, plaintiff's counsel sought to have the court's disposition as to said articles governed by this court's decision concerning such articles in the case of General Instrument Corporation v. United States, 65 Cust. Ct. C.D. 4151, which was tried on April 23 and 24, 1969, and decided on December 21, 1970. At the time of the trial of the instant protests the court had fully intended to be able to decide the issue of yokes in C.D. 4151, then awaiting decision, on the merits; and with that understanding and the consent of counsel, it was agreed that the disposition of yokes in C.D. 4151 would govern the disposition of yokes under protest 69/32727. However, as it developed C. D. 4151 was disposed of on jurisdictional grounds adverse to the plaintiff here, and the court never reached the merits of the claims as to yokes. Consequently, in C.D. 4151 protests 68/26411 and 68/26412 covering yokes were restored to the calendar for retrial. The parties have not noticed these protests for trial. Hence, in all fairness to the plaintiff here, and regardless of the court's disposition of the sole remaining issue involving transistors, protest 69/32727 will have to remain open so as to give plaintiff an opportunity to try or otherwise dispose of its claims as to the yokes.

We decide today only the issue as to transistors, concerning which there has been a plenary trial and full submission of briefs.

The transistors in question, identified on the invoices only in terms of their component parts, were classified in liquidation under the provision for transistors in item 687.60 of the tariff schedules at the duty rate of 12½ per centum ad valorem. It is claimed by plaintiff that an allowance in duties pursuant to item 807.00 of the tariff schedules

should be made for certain gold wire which is incorporated in the transistors. The gold wire provides the electrical connection between the three metal leads of the transistor at bar which, according to the evidence, is known as the TO18 epoxy transistor. It is said that this transistor finds use in almost any form of electronic apparatus from a television receiver through a computer, medical instruments, radar sets, military equipment, and electronic organs. Item 807.-00, as amended by Public Law 89–241, 79 Stat. 933 (section 85, Tariff Schedules Technical Amendments Act), provides for the payment of duty upon the full value of imported articles less the cost or value of products of the United States, as to:

> Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported, in condition ready for assembly without further fabrication, for the purpose of such assembly and return to the United States, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting * * *.

It is agreed by the parties that the wire in question is a fabricated component, the product of the United States. And uncontroverted testimonial, documentary, and physical evidence adduced by plaintiff in the record establishes the following: (a) that the wire in issue is manufactured in this country especially for transistor use and is purchased here by plaintiff on spools for such use; (b) that said wire is exported on the spools to plaintiff's plant in Taiwan; (c) that in plaintiff's Taiwan plant said wire is taken directly off the spool while in continuous, unbroken form, and, with the aid of machinery and other apparatus operated and handled by plant workers, said wire is applied and bonded to one of two aluminum strips which are affixed to a silicon chip or die pad which is in turn bonded to the head of a metal lead termed a "clubhead" lead and then cut from the spool to a predetermined length; (d) that in the same fashion a second length of said wire is taken from the spool and bonded to the same clubhead lead on the other end of the die pad to which is affixed the other aluminum strip and then cut to the same length as the first wire; (e) that the clubhead lead with the two gold wires attached, together with two "nailhead" leads, are then inserted and positioned in a ceramic bead constituting the body or housing of the transistor where the free ends of the gold wires are located and welded to the top of the nailhead leads, thus completing the electrical connections between the metal leads (clubhead and nailhead); that the top of the ceramic bead is then covered and sealed with a blob of epoxy to protect the unit from dirt and handling; and (f) that although a small number of these transistors are produced in the United States by plaintiff for control purposes, plaintiff has most of these transistors manufactured in Taiwan so as to be competitive, in terms of cheaper labor costs, in the marketing of this product.

The foregoing constitutes the salient evidence bearing upon the issue of duty exemption provided for in item 807.00. At the outset we wish to state that we do not think it is necessary for us to determine in this case whether the supplementary explanatory material relating to item 807.00 which is found on page 103 of the Seventh Supplemental Report of the Tariff Commission on the Tariff Classification Study [stating that U. S. wire on spools is not a finished component] is applicable. This explanatory material was written by the Tariff Commission as a clarification aid to the item 807.00 language that the Commission originally drafted and submitted to Congress in the Tariff Classification Study.

That language has since been superseded by new language written into item 807.-00 by Congress under the Tariff Schedules Technical Amendments Act (1965), Congress having found "that in certain respects the item is ambiguous".* Consequently, in the construction of item 807.00, we are inclined to be guided by the legislative intent as expressed in the congressional committee reports underlying the Tariff Schedules Technical Amendments Act, and not by prior legislative aids, should the occasion arise to require resort to legislative history. And these legislative reports do not indicate any intention on the part of Congress of including metal products and other hard goods among the articles to be excluded from the application of item 807.00 treatment.

Moreover, here the parties have stipulated that the involved merchandise is a "fabricated component the product of the United States," thus, in our opinion, placing the subject merchandise within the ambit of item 807.00 by agreement. Consequently, it remains only for the court to determine on the basis of the evidence whether the statutory requirements and conditions written into item 807.00 have been complied with in the production of the imported transistors.

■ On the evidence noted hereinabove, we are of the opinion that the requirements of subdivisions (a) and (c) of item 807.00 have been met and satisfied in this case. And insofar as the cutting of the wire is concerned this operation is not unlike that performed on the polyester film of United States manufacture in C. J. Tower & Sons of Buffalo, Inc. v. United States, 304 F.Supp. 1187, 62 Cust.Ct. 643, C.D. 3840 (1969). In the *C. J. Tower* case the polyester film was exported from the states in rolls to the foreign country where, during the assembly process, the polyester film was unrolled and mated or joined with a polyethylene film of foreign manufacture and then cut to length. And such cutting did not deter the court in that case from concluding that the polyester film, at the time of exportation from the United States, was ready for assembly without further fabrication.

Similarly, in the case at bar we do not think the severing of the gold wire from the spool during the Taiwan operation constitutes a further fabrication of the wire. This severing or cutting of the wire enabled the operator to *fit* the wire to the nailhead leads. And "fitting" of a component is an essential part of an assembly operation. See definitions of the word "assemble" cited in C. J. Tower & Sons of Buffalo, Inc. v. United States, *supra*, 304 F.Supp. at page 1189, 62 Cust.Ct. at page 646.

With respect to subdivision (b) of item 807.00, testimony of the witnesses is pertinent. Richard F. Adler, plaintiff's vice-president and general manager of the semi-conductor component division, who holds an engineering degree, testified that scientists and technicians under his supervision have conducted tests of the involved gold wire both before and after assembly in Taiwan and have reported that there is no change in the characteristics of the wire as the result of the Taiwan operation (R–40). And more particularly on this subject, Dr. Barry Liles, director of research in plaintiff's discrete component division and a physicist, testified, among other things, that the application of wire in the assembly of the TO18 transistor "does not result in any change in the form, shape, or physical properties" of the wire (R–68). Taking this uncontroverted testimony at face value, it would appear that there is no loss of physical identity of the gold wire in the imported transistor by change in form or shape.

---

* H.Rept. 342, 89th Cong., 1st Sess. on H.R. 7969, p. 48; U.S.Code Cong. & Admin.News 1965, pp. 3439, 3448–3449.

Has the wire sustained a loss of physical identity in the transistor *otherwise*? We think so.

Inasmuch as the emphasis in subdivision (b) of item 807.00 is on loss of physical *identity* and not on loss of physical *being*, it is clear that after assembly of the transistor is complete there has been a loss of physical identity of the subject wire in the transistor by permanent concealment of the wire beneath the blob of solidified epoxy which protects it. And in this posture the wire, which is scarcely visible to the naked eye under ordinary conditions, cannot be seen by customs officials for inspection purposes upon importation of the transistors without detachment of and consequent injury to a constituent part of the transistor. It was to obviate the necessity for such disassembly of imported articles for compliance inspection purposes that subdivision (b) of item 807.00 was enacted by Congress, in the interest of relieving the customs officials of an undue administrative burden. See H.Rept. 342, *supra,* at page 48. Thus, subdivision (b) assists in "enabling the customs officials to be able to follow the res into the foreign country and back into the United States without loss of identity." C. J. Tower & Sons of Buffalo, Inc. v. United States, *supra,* 304 F.Supp. page 1192, 62 Cust.Ct. page 649.

Since the gold wire in the involved transistors cannot be readily identified by virtue of concealment, there has been, in our opinion, a loss of physical identity of such wire within the meaning of subdivision (b) of item 807.00. As such, the wire is not entitled to the duty exemption claimed under item 807.00, and the claim therefor was properly disallowed by the regional commissioner of customs. It follows, therefore, that the claim in the involved protests under item 807.00 must be, and, therefore, is overruled.

Judgment will be entered accordingly.