59 CCPA

**GENERAL INSTRUMENT CORPORA-
TION, Appellant,**

v.

**The UNITED STATES, Appellee.**

**Customs Appeal No. 5468.**

United States Court of Customs
and Patent Appeals.

July 27, 1972.

Eugene L. Stewart, Lincoln & Stew-
art, Washington, D. C., attorneys of
record, for appellant.

Charretts, Paley, Carter & Blauvelt,
Louis Schneider, New York City, amicus
curiae, of counsel.

Alan H. MacPherson, Palo Alto, Cal., Special Counsel to Electronic Industries Assn., amicus curiae.

L. Patrick Gray, III, Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, Robert Blanc, New York City, for the United States.

Before WORLEY, Chief Judge, and RICH, ALMOND, BALDWIN and LANE, Judges.

RICH, Judge.

This appeal is from the decision and judgment of the Customs Court, 326 F. Supp. 1393, 66 Cust.Ct. 367, C.D. 4216 (3rd Div.1971), overruling two protests, consolidated for trial, involving transistors imported from Taiwan and entered in May and June 1966. There is no dispute about the classification, which was under TSUS item 687.60 with duty at 12½% ad valorem. We reverse.

The sole issue on this appeal is whether the importer is entitled under item 807.00 to deduct from the duty on the transistors the value of certain gold wire used in making them. Item 807.00, as amended by the Tariff Schedules Technical Amendments Act of 1965, P.L. 89–241, reads:

807.00 Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported, in condition ready for assembly without further fabrication, for the purpose of such assembly and return to the United States, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A duty upon the full value of the imported article, less the cost or value of such products of the United States (see headnote 3 of this subpart).

---

There is no issue as to the value of the gold wire. Additionally, it was stipulated at the trial that "the gold wire in question is a fabricated component the product of the United States."

At the trial two witnesses testified for the importer and a number of physical exhibits were introduced. The Government introduced no evidence. Importer's evidence clearly shows the construction of the transistors and explains the method of their manufacture with respect to the use of the gold wire as a component. We will summarize the facts insofar as they are pertinent to the issues.

The completed transistor is a small object consisting of an insulating body, three terminal wires or leads for connecting the transistor into an electronic circuit, a semiconductor chip or die mounted on one of the leads, two short pieces of fine gold wire connecting parts of the chip to the other two leads, and a blob of hardened or set epoxy resin which covers the chip, its connection

with the leads, and the top surface of the body. The body is cylindrical, is about ⁵⁄₁₆″ in diameter and ⅛″ thick, and has 3 holes through it parallel to its axis. One of the leads has an end turned over and flattened (the "club-head" lead), and the die is mounted on this end. The silicon die or chip is about 0.025″ on a side and has aluminum contact strips on it not over 0.002″ wide to two of which gold connecting wires, which are 0.001″ in diameter, must be bonded. Due to the small sizes of the parts and the fineness of the gold wire, which is barely visible to the naked eye, highly specialized techniques are required for handling and bonding it to the die. Important here is the fact that the gold wire is exported from the United States in long lengths—50 to 300 feet—on spools from which it is drawn in the Taiwan assembly plant in the process of assembling the transistor components. First, a free end of the wire is heat- and pressure-bonded by an operator to an aluminum strip on the die, under a microscope. The wire is severed at the desired point by a flame, and the free end of the wire on the spool is then bonded to the other aluminum strip on the die and again severed, resulting in a lead on which the die is mounted with the two gold wires attached to it as a sub-assembly which is inserted into the body. The other two leads are provided with "nail" heads. They are inserted in the other two holes in the body. Then an operator manipulates each of the gold wires into contact with one of the nailhead leads and welds it thereto. Also significant here is the final step of manufacturing the transistor in which the top of the body and the parts thereon, including the heads of the three leads, the silicon die, and the fine gold connecting wires, are covered over with epoxy resin, evidently in the liquid state, which is then heat cured to convert it to the solid state. The epoxy is of dark color and opaque so that what is under it is not visible. This epoxy resin serves as a protective covering for the delicate parts embedded in it.

The uncontroverted evidence is that in the course of using the gold wire in the manner above described, to make electrical connections between the silicon die and the nailhead leads, the physical, chemical, and electrical properties of the wire and its diameter are not changed. The bulk wire is, obviously, cut, and the pieces are bent and welded or otherwise bonded at their ends in the process of removing the wire from the spool and using it for its intended purpose as a component in the transistors.

Under item 807.00, the question below was whether the importer had shown compliance with conditions (a), (b), and (c), compliance with the introductory clause having been taken out of consideration by the stipulation. The Customs Court found that (a) and (c) had been met. It held against the importer only under (b). While finding that there had been no loss of "physical identity" by change in form or shape, it found that physical identity had been lost "otherwise," "by permanent concealment of the wire beneath the blob of solidified epoxy which protects it." Explaining its decision, the court said,

> And in this posture the wire, which is scarcely visible to the naked eye under ordinary conditions, *cannot be seen* by customs officials for inspection purposes upon importation of the transistors *without detachment of and consequent injury* to a constituent part of the transistor. [Emphasis ours.]

Appellant, supported by two amicus briefs, attacks the lower court's conclusion by contending, persuasively we feel, that item 807.00 does not require that a component be either visible or detachable without injury to itself or to the assembly.

Emphasizing the impracticability of the lower court's "visibility" test, the amicus brief on behalf of the Electronic Industries Association (E.I.A.) says:

> The incongruity of this result is fully apparent when one considers, for example, light bulbs assembled abroad with U.S.-made filaments. The fila-

ment in a clear light bulb would receive duty-free treatment under item 807.00. The same filament in a frosted or colored light bulb would be denied duty-free treatment. TSUS item 807.00 provides no justification for this bifurcated result.

The same brief points out that further more the "visibility" test will not necessarily detect further fabrication abroad of U.S.-made components when the further fabrication does not change the form or shape of the component.

Looking to the statute itself, it is clear that there is nothing in item 807.-00 itself which could give rise to a visibility-without-injury test. The word "otherwise" in condition "(b)" does not possess such a clear meaning as to preclude reference to legislative history as an aid to determining the legislative intent. Looking to legislative history, it is our opinion that not only is there no support for the Customs Court's visibility-without-injury test but that a contrary intent is manifest. The Government's brief seems to us to concede this point which, therefore, we are not disposed to labor. It cites the same passages from the Tariff Commission Study (1960), subpart B, Part 1, Schedule 8, pages 14–15, on which appellant and the amici rely and states agreement that this is a proper case for consideration of legislative history. It says it is apparent from the Study that item 807.-00 "was meant to change the idea that the components had to be able to be removed from the imported articles without injury to themselves or to the articles with which they had been assembled in order to qualify for tariff treatment as American goods returned." It says, "We are not here suggesting that in all cases it is necessary for the component to be visible to the naked eye for Customs to grant exemption under item 807.00." It does not "quarrel" with the statement in the E.I.A. amicus brief "that there is more than one way of determining whether there has been a change in condition," E.I.A. having

argued that there are many ways other than visible inspection to find out whether the gold wire is in the transistors and whether its properties have been changed. The Government's brief sums up on this point with the coup de grace for the lower court's theory in saying,

> While it may no longer be necessary for an American component to be physically separable, without injury, from the remainder of the importation, and while a visual examination may not be necessary in all instances, there must be some means of identifying the article to the satisfaction of Customs.

And indeed there must. The Government, having flushed the lower court's theory down the drain, shifts the argument to the contention that in this case the Bureau of Customs was not satisfied with the evidence and therefore the lower court was justified in doing what it did. On reflection, it seems to us that *all* the cases we get for review are here because the Customs officials have not been satisfied. It is the Customs Court's task to pass on the *sufficiency* of the evidence, and the dissatisfaction of the Customs officials, per se, is not relevant to that task. Moreover, the evidence before the Customs Court here being reviewed was not before the Customs officials; it was submitted in support of protests. The arguments before us are based on that evidence.

 If consideration be given to the problem of what evidence should be provided to the Customs officials, as distinguished from evidence introduced in litigation, we find legislative history and reason both support the proposition advanced by appellant and its supporters, namely, that ascertainment of the relevant facts under item 807.00 is almost wholly dependent upon extrinsic paper proof and statements set forth on the invoices and entry papers rather than upon physical examination of the imports by Customs officials. In cases

where the Customs officials desire to verify the importer's assertions, the importer may be willing to submit samples of the importations to destructive testing, and sometimes the relevant facts may be verifiable by non-destructive, but non-visual, testing. Therefore whether a component is hidden from view has no bearing on whether it qualifies for treatment under item 807.00. We therefore find the sole ground on which the lower court rested its decision to be in error.

The Government, appellee, raises another point in its brief in support of the judgment below but on which it *lost* below. The Government filed no cross-appeal and of course no assignment of error to bring before us, on appellant's appeal, a point not raised by appellant's assignments of error. This point—which appellee would make an issue before us—is that the *cutting* of the gold wire from the spools excludes the wire from item 807.00 treatment. The theory is that the wire was not "exported in condition ready for assembly," because it had to be cut to size. The theory is obviously based on non-compliance with condition "(a)" of item 807.00. The Customs Court opinion devotes a page to discussing this question and the conclusion reached was that "the severing of the gold wire from the spool during the Taiwan operation" does not constitute a "further fabrication" of the wire. It therefore concluded that subdivision (a) had been met.

■ At oral argument we raised, sua sponte, the question whether this point is before us for consideration, neither party having expressed any opinion on that question in its brief. Through an abundance of foresight appellant briefed the point in its initial brief, thereby avoiding the filing of a reply brief, notwithstanding it prevailed thereon below. At oral argument it did not object to appellee's argument of the question but merely said it had won on it and that no point was being made of the absence of a cross-appeal. There appear to be precedents both ways as to whether we should consider the issue. United States v. F. W. Myers & Co., 29 CCPA 34, 39, C.A.D. 168 (1941), discusses them. Under the circumstances of this case we have decided to consider the cutting issue on the basis of the rule in United States v. Astra Bentwood Furniture Co., 25 CCPA 340, 343, T.D. 49434 (1938), discussed in *Myers*, which held, in a somewhat analogous situation, that the appellee could argue an issue in this court and have it passed upon without filing cross-errors where it was not seeking a more favorable judgment than it already had. See also Nichols & Co. v. United States, 454 F.2d 1183, 1186, 59 CCPA 67, ——, n. 4, C.A.D. 1041 (1972).

■ The decision below relied for support on C. J. Tower & Sons of Buffalo, Inc. v. United States, 62 Cust.Ct. 643, C.D. 3840, 304 F.Supp. 1187 (1969), wherein polyester film was cut from rolls during the assembly process yet held to be ready for assembly without further fabrication. We are told by appellee that whether such cutting is a "further fabrication" has never been passed upon by this court. We are particularly loath under such circumstances to make any general pronouncement on the effect of cutting on the applicability of item 807.00 and, as we usually try to do, we limit our opinion to the facts of this case. Having considered the parties' arguments and the facts of record and bearing in mind the stipulation that the "gold wire in question is a fabricated *component* the product of the United States" (our emphasis), we are of the opinion that the wire was used directly in the assembly process "without further fabrication." Nothing whatever was done to it after exportation to prepare it for use, and it was then "ready for assembly." It was not even cut until it had been bonded to the silicon die in the assembly process which, for practical reasons, required handling the wire directly from the spool. We therefore

agree with the Customs Court that condition (a) of item 807.00 had been met.

For the foregoing reasons, the judgment of the Customs Court is reversed.

Reversed.

WORLEY, J., did not participate in the decision of this case.