C. J. TOWER & SONS OF BUFFALO, INC., a/c Metco, Inc.

v.

UNITED STATES.

C.D. 4559;  Court No. 70/30847–7548.

United States Customs Court.

Sept. 26, 1974.

**980**

Serko & Sklaroff, New York City, (Murray Sklaroff, New York City, of counsel), for plaintiff.

Carla A. Hills, Asst. Atty. Gen., (Frederick L. Ikenson and Wesley K. Caine, New York City, trial attys.), for defendant.

RICHARDSON, Judge:

The merchandise in this case, described on the invoice as "Composite PDR 82NI/AL18", was exported from Canada in October, 1968, and classified in liquidation upon entry at Buffalo-Niagara Falls, N. Y. under TSUS item 657.50 as modified by T.D. 68–9 as articles of nickel, not coated or plated with precious metal, at the duty rate of 16 *per centum ad valorem*. It is claimed by the plaintiff-broker that the merchandise should be classified under TSUS item 620.32 as modified by T.D. 68–9 as nickel powders, free of duty.

It is admitted in the pleadings before the court that the powder is in chief weight and value of nickel, and that each particle of the powder consists of a core material of aluminum coated with nickel. In issue under the pleadings is plaintiff's allegation that the merchandise at bar is purchased and sold as composite powder, 82% nickel and 18% aluminum. However, prior to trial herein, and solely for purposes of its cross-motion, the defendant admitted this particular allegation in the complaint when the issues raised by the pleadings were before the court for disposition on plaintiff's motion for judgment on the pleadings and the defendant's cross-motion for the same relief. See C. J. Tower & Sons of Buffalo, Inc., a/c Metco, Inc. v. United States, 68 Cust.Ct. 377, 378, C.R.D. 72–11, 343 F.Supp. 1387 (June 15, 1972).

In C.R.D. 72–11 the court (Maletz, J.) denied both the aforesaid motion and cross-motion. In denying the motion, the court said:

> It was not alleged in the complaint, nor can the court conclude from the pleadings, that the merchandise is nickel or nickel alloy in a basic shape or form. For one thing, the imported merchandise is obviously not nickel *per se* in view of the presence of the aluminum. Further, absent admissions or receipt of additional facts, such as the method of production or manufacture, there is no basis upon which the court can determine whether the merchandise is an alloy within the meaning of schedule 6, part 2, headnote 2(a) that is, a "metallic substance consisting of two or more metals * * * intimately united, usually by having been fused together" or a sintered mixture of metal powders obtained by fusion or a heterogeneous intimate mixture obtained by fusion. [343 F.Supp. p. 1392.]

In connection with this phase of its opinion the court concluded that the provision for nickel applied only to an importation of nickel in a pure state down to a content by weight of 99.0 percent and in a basic shape or form, and that such provision, among others, could not be satisfied with the application of the component material of chief value concept.

In denying the cross-motion, the court said:

> Considering the present pleadings with the foregoing in mind, it cannot be said with any degree of certainty that plaintiff would be unable to offer proofs tending to establish the ultimate facts necessary to support its claim for classification of the merchandise as nickel powder under item 620.32, specifically, that it is a nickel alloy in a basic shape or form. This being the situation, plaintiff should not be foreclosed from the opportunity to present its proofs. . . . [343 F.Supp. p. 1393.]

Following disposition of the motions as aforesaid the case was brought to

trial and evidence presented as to the method of manufacture of the subject merchandise and its uses, among other things, at the conclusion of which trial plaintiff moved for a decision by the court from the bench on the issue of whether plaintiff had established the imported merchandise to be a nickel alloy. The court, however, reserved decision in the case.

In its main brief plaintiff argues not only that the subject merchandise is a nickel alloy powder, but also that it is a nickel powder by reason of nickel being the component material of chief value, and that Judge Maletz' decision on plaintiff's prior motion excluding the component material of chief value theory from application under item 620.32 is erroneous. Defendant argues that Judge Maletz' rulings in C.R.D. 72–11 constitute the law of the case and should preclude inquiry by this court as to whether the imported merchandise is a nickel powder as distinguished from an alloy of nickel, that the merchandise is not an alloy of nickel because its two metals, while united, are not intimately united in that there has been no complete intermixture or fusion of the metals, and that perforce of the law of the case doctrine derived from the court's rulings in C.R.D. 72–11 plaintiff has not shown the imported merchandise to be in a basic shape or form.

■■ The rulings by Judge Maletz are deemed the law of the case here for purposes of resolution of this case. When one judge sitting in a case establishes the law of the case, a second judge subsequently sitting in the case should normally follow the ruling of the first judge. See: Williams v. New Jersey-New York Transit Co., 1 F.R.D. 138 (S.D.N.Y., 1940), and Riss & Company v. Association of Western Railways, 162 F.Supp. 69, 72 (U.S.D.C., D. C., 1958). And since the rulings in C.R.D. 72–11 foreclose plaintiff from arguing anew that the subject merchandise is nickel *per se,* or that the phrase "basic shapes and forms" is used in schedule 6, part 2, of TSUS in a cumulative context and not as a *limitation,* the only issue presently before this court for disposition is whether the imported merchandise has been shown to be an alloy of nickel in a basic shape or form.

The statutes pertinent to this issue read:

[classified]

Schedule 6, Part 3, Subpart G, Tariff Schedules of the United States, as modified by the Geneva (1967) Protocol to GATT and Other Agreements, and Presidential Proclamation, T.D. 68–9.

Subpart G headnotes:

1. This subpart covers only articles of metal which are not more specifically provided for elsewhere in the tariff schedules.

\*     \*     \*     \*     \*     \*     \*     \*

657.50   Articles of nickel, not coated or plated with precious metal ............................ 16% ad val.

[claimed]

Schedule 6, Part 2, Subpart E, Tariff Schedules of the United States, as modified, *supra.*

*Part 2 headnotes:*

1. This part covers precious metals and base metals (including such metals when they are chemically pure), their alloys and their so-called basic shapes and forms, and, in addition, covers

metal waste and scrap. Unless the context requires otherwise, the provisions of this part apply to the products described by whatever process made . . . ..

2. *Alloys.—*. . . Alloys are metallic substances consisting of two or more metals, or of one or more metals and one or more non-metals, intimately united, usually by having been fused together and which may or may not have been dissolved in each other when molten; they include sintered mixtures of metal powders and heterogeneous intimate mixtures obtained by fusion, but do not include substances in which the total weight of the metals does not equal or exceed the total weight of the non-metal components.

\* \* \* \* \* \* \* \*

Subpart E headnotes:

1. This subpart covers nickel, its alloys, their so-called basic shapes and forms, and also includes nickel waste and scrap.

2. *Alloys of nickel:* For the purposes of the tariff schedules, alloys of nickel are metals in which the nickel content is, by weight, less than 99.0 percent, but not less than any other metallic element. In the absence of context which requires otherwise, the term *"nickel"*, wherever used in the tariff schedules, includes alloys of nickel.

\* \* \* \* \* \* \* \*

Nickel powders and flakes:

\* \* \* \* \* \* \* \*

620.32 Powders ................................. Free

---

The evidence presented at the trial establishes that the imported merchandise is manufactured in Canada by the Sherritt Gordon Mines, Limited, of Fort Saskatchewan, Alberta, Canada, who employs a patented hydrogen reduction method for transferring nickel particles onto suspended cores of aluminum particles, the details of which manufacturing method were described at length by a witness connected with Sherritt Gordon Mines. Under this method of production nickel ore is concentrated, then leached and boiled so as to yield a solution of pure nickel. The nickel is then deposited onto suspended aluminum particles in a nickel reduction autoclave.

The aluminum powder utilized in the manufacture of the imported merchandise was sent to Canada by Metco, Inc. of Long Island, N. Y., who is the ultimate consignee of the merchandise at bar. And the ratio of nickel to aluminum in the resulting composite powder imported herein is on the order of 80 to 83% nickel and 17 to 20% aluminum.

The composite nickel/aluminum powder imported herein is marketed by the ultimate consignee as a consumable product known as Metco 404 for use in a flame spray process by means of which a metallic coating is supplied to various metal surfaces. During the flame spraying process, the equipment for which is

also marketed by Metco, the composite powder at bar is converted to nickel aluminide which forms a metallurgical bond and aftercoating to the surface of metals to which it is applied.

In describing the relationship between the nickel matrix and aluminum core of the imported powder, Dr. David John Ivor Evans, director of the research and development division of Sherritt Gordon Mines, testified (R. 43–45):

Q. Would you tell us, please, the physical relationship between the nickel and the aluminum in the composite powder under discussion?—A. I think the photographs have shown this very clearly, and—

Q. Which photographs in particular, doctor? If you are speaking of photographs I would appreciate it if you took these and read the numbers off the back rather than any other notes that you may have.—A. I think these photographs illustrate to anybody engaged in working in the field of metallurgy, indicate very clearly that the nickel and the aluminum are as close as they can possibly be to one another.

Q. Which photographs are you speaking of, doctor?—A. I am speaking in particular of Exhibit No. 9, and Exhibit No. 10.

Q. No. Check the numbers on that.—A. Exhibit 11, sorry. These two indicate that there is no barrier between the nickel and the aluminum. They are as closely united as they can possibly be.

Q. Would you refer to that as intimately united?

\* \* \* \* \* \*

A. In my terminology, I would say they are very, very definitely intimately united. And there is no physical means that I am aware of for separating the nickel from the aluminum in this powder form. There is no physical means of making that separation. It is quite different from a mixed powder. If we had a powder of aluminum particles then they could be separated very easily either by a density difference or by magnetic separation. So, it is definitely not a mixed powder. The relationship between the two is much more intimate than of a mixed powder.

Evidence was adduced by the defendant bearing upon the industry usage and understanding of the term "alloy", and also of chemical, spectrographic and X-ray analyses made on a sample of the merchandise at bar by the Government. Witnesses called on behalf of the Government, namely, a chemist in the employ of the customs service and an expert in the field of metallurgy, were of the opinion that the nickel and aluminum components of the imported powder could be separated by physical means. However, neither witness was able to testify concerning any such physical means of separation of the constituent metals.

It is settled law that where, as here, Congress has provided a clear definition of terms employed in a tariff statute the industry understanding of those terms does not determine the construction to be given them by the courts. United States v. Stone & Downer Co., 274 U.S. 225, 47 S.Ct. 616, 71 L.Ed. 1013 (1927). See also, E. H. Bailey & Co. v. United States, 10 Cust.Ct. 170, C.D. 746 (1943).

Plaintiff contends that the imported powder comes within the ambit of the statutory definition of the term "alloy" noted herein. And defendant, on the other hand, disavows that claim. Obviously, the key phrase in the statutory definition in question is the phrase "intimately united". It is clear that the language of the definition which immediately follows the phrase "intimately united" down to the word "but" is at best *directory* of the scope of the phrase "intimately united" and is not a *limitation* on the phrase. Hence, the question to be determined here is whether the nickel and aluminum constituents of the imported powder are "intimately united" even though they are not the product of fusion or sintering. Also, the defini-

tion indicates that the method of uniting the constituent parts is *usually* by fusion "together and which may or may not have been dissolved in each other when molten." The word "usually" does not mean "always" and admits the possibility of other ways of intimately uniting constituent parts of metal substances.

■ It appears to the court that the statutory definition in question is the product, at least in part, of the common understanding of the term "alloy", modified to reflect the desire of the framers of the language to broaden the scope of the term. See: Tariff Classification Study, Schedule 6, pages 86–88. Some of the words employed in the statutory definition of "alloy" derive almost verbatim from the definition of the term found in Webster's Third New International Dictionary on page 58 (1961 edition) which reads:

> alloy . . . 3 a: a substance composed *of two or more metals intimately* mixed and *united usu. by* being *fused together and* dissolving *in each other when molten* . . . . [Emphasis added.]

But it seems that the framers of the definition in issue, in borrowing language from Webster, omitted the word *mixed* which followed the word *intimately* in Webster's definition, and, also modified the exemplar taken from Webster to indicate that particle fusion need not always result from mutual dissolution. Thus, it would appear that Congress did not intend that the statutory definition of "alloy" required any intermixture of the constituent metals.

Consequently, the phrase "intimately united" must be regarded as being broader than the scope contended for by the defendant.

■ ■ The court is of the opinion that the phrase "intimately united" as employed in the statutory definition of the term "alloy" was intended by Congress to apply to a combination of metals, among other things, in close contact, association, or connection with each other, and that interpenetration of the abutting surfaces of the combined metals was not prerequisite to inclusion of the combination within the definition. In the opinion of the court the statute puts emphasis on *unification*, and not on the *means* by which such unification is attained.

■ The evidence presented by the plaintiff in this case that a degree of unification of the constituent metals of the imported powder has been achieved satisfies both the general and specific requirements set out in the statutory definitions under consideration. A metal powder is of a basic shape or form, and there is no question in the court's mind but that the imported powder is in a basic shape or form. Both the core and the matrix were in powder form, and the end product resulting from their union remained in powder form. No additional proof would seem to be required of plaintiff at this point.

For the reasons stated, plaintiff's claim that the imported merchandise is a nickel alloy powder is sustained. Judgment will be entered accordingly.