The **RUBBERSET COMPANY** and the Sherwin-Williams Company et al.

v.

**UNITED STATES.**

C.D. 4560; Court Nos. 70/56365, 70/56364, 70/56363 and 70/56361.

United States Customs Court.
Oct. 1, 1974.

Barnes, Richardson & Colburn, New York City (Rufus E. Jarman, Jr., and James F. Donnelly, New York City, of counsel) for plaintiffs.

Carla A. Hills, Asst. Atty. Gen. (James Caffentzis, New York City, trial attorney), for defendant.

RICHARDSON, Judge:

The merchandise of these cases which were tried jointly consists of paint brush knots and paint brushes exported from Canada and classified in liquidation upon entry at the port of Buffalo-Niagara Falls, N.Y. under TSUS item 750.65 at the duty rate of 18 *per centum ad valorem*, with duty allowances being made for a number of components of American origin pursuant to TSUS item 807.00. In question in these cases is the refusal of the district director of customs to make an allowance in duty under item 807.00 for the nylon bristles or filaments of American origin which are contained in the imported knots and brushes.

Plaintiffs contend that the nylon filaments meet the requirements of item 807.00 and are, therefore, entitled to the duty allowances provided for in that statute. Defendant contends that the filaments were properly denied item 807.00 treatment because at the time of their exportation from the United States they required further fabrication prior to assembly in Canada.

Item 807.00, TSUS, provides for the payment of duty upon the full value of

the imported article less the cost or value of the American products as to

Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting.

The imported knots and brushes are made up of five or six parts. In the case of the knots these parts consist of nylon filaments, a center piece or plug, epoxy setting material, an aluminum insert, and a metal ferrule. In the case of the brushes a wooden handle is added to the other parts.

Both the knots and the brushes contain filaments of different lengths—some as many as six different sizes. And the filaments are tapered by about 33⅓% from the butt end to the tip or paint-applying end.

The record shows that the disputed filaments were exported to Canada from the United States in the form of bundles measuring about 2½ to 3 inches in diameter held together by rubber bands, one size to a bundle, and packed in cartons weighing approximately 25 pounds. Some of these bundles contain filaments which are raw, i. e., have not been tipped and flagged.[1] But prior to their meeting up with other parts of the knots and brushes the filaments are homogeneously mixed together either in Canada where one end is butt ground[2] or in the United States prior to exportation.

In Canada the mixed filaments are broken down into "batch" quantities and then into "machine-load" quantities. A worker takes a handful of the mixed filaments approximating the quantity required for a particular knot or brush. These filaments are placed in a balance scale, counterbalanced by a "control sample" of the desired weight. The worker adjusts the original estimate by adding or taking away filaments until an even balance is achieved.

The weighed out filaments are slipped into a ferrule and butted down to a point where all the butt ends are uniform and even with the back of the ferrule. The ferrule is slipped back slightly, the filaments parted with a knife blade, and a wooden plug is inserted amongst the butt ends. The worker next uses a "push stick" to push the butt ends to the proper point in the ferrule, thus producing a space for the subsequent pouring of epoxy setting material.

An aluminum insert is then placed in the ferrule behind the nylon filaments, and a measured shot of epoxy is poured inside the ferrule. The epoxy seeps through the holes of the insert and into the filament butt ends. The knot is allowed to stand for a number of hours to permit hardening of the epoxy. And the finished knot is then wrapped and packed for shipment to the plaintiff in the United States.

In the case of the brushes, the brushes are made in the same manner as are the knots, except that the brushes are made from filaments received in Canada unmixed. A wooden handle is inserted into the ferrule and nailed. The top of the brush filaments is ground on a sanding belt and the brush run through a whip-out machine which removes loose filaments.

In support of its contention, plaintiffs argue, among other things:

The articles exported were the individual filaments or bristle compo-

---

1. "Tipping" is a process whereby the small end of the nylon filament is pointed by grinding wheels to remove bluntness; "flagging" is the splitting of the small ends with knives.

2. A "grinding" operation performed on the butt end of the filament to roughen it, tending to produce a more solid bond with the epoxy which is applied during a later operation.

nents; not bundles into which it was found expedient to group them for transportation. It is irrelevant that a bundle did not contain the precise number of bristles to make one or two or any other number of brushes. Certainly, unpacking and separating the bristles into the proper groupings is not a process of manufacture or other advancement in condition which would preclude applicability of Item 807.00.

It is now well settled that articles are not precluded from 807.00 treatment merely because they are shipped in bulk. . . .

To this argument defendant replies:

. . . the nylon filaments were exported from the United States in bundles. The component therefore, is not the individual nylon filaments, but rather the bundled form. E. Dillingham, Inc. v. United States, 60 CCPA 39, C.A.D. 1078, 470 F.2d 629 (1972).

\* \* \* \* \* \*

. . . the nylon filaments at bar were subject to essential and necessary Canadian operations, all of which took place prior to their meeting up with the metal ferrule component.

On the instant facts the court agrees with the defendant's argument. In E. Dillingham, Inc. v. United States, 60 CCPA 39, C.A.D. 1078, 470 F.2d 629 (1972), relied upon by defendant, the merchandise consisted of bulk fiber shipped to Canada together with fabric to be made up there into papermakers felt and returned to the States. In rejecting the appellant's (importer's) argument that the individual fibers must be considered as a component of the assembled article for purposes of item 807.00, the appellate court said:

. . . We believe that the fiber must be considered to be a component in the bulk, baled form, *en masse*, in which it left the United States.

And the court went on to state:

Considering item 807.00 clause (a), we must determine whether operations performed on the exported component between its arrival abroad and the assembly, show that the component, as exported, was not "in condition ready for assembly without further fabrication." . . .

In the *Dillingham* case our appeals court was of the opinion that *assembly* did not occur until the fiber component came together with the fabric component. And the court there found the interim operations on the fiber to consist of at least *opening, oiling,* and *carding,* and held these operations to constitute "*further* fabrication" necessary to make the fiber component ready for assembly.

■■ In the instant case the court is of the opinion that the facts at bar are analogous to those in the *Dillingham* case. Although the evidence at bar shows that the operations performed in Canada on the various knots and brushes involved herein were not uniform, nevertheless, all cases involved a breaking down into batch quantities, and then sorting into machine-load quantities by weight and size in order to produce the ingredients for any one knot or brush and thereby permit the joining of the selected filaments with other components. And without this essential processing the filaments as exported would not be capable of being assembled. This interim processing, in the court's view, constitutes "further fabrication" within the meaning of item 807.00 clause (a). The word "fabricate" from which the statutory word "fabrication" is derived means, among other things, "to form into a whole by uniting parts: CONSTRUCT, BUILD . . ." [Webster's Third New International Dictionary (1961 edition)].

The case of General Instrument Corporation v. United States, 60 CCPA 178, C.A.D. 1106, 480 F.2d 1402 (1973), relied upon by the plaintiffs here, does not require a different conclusion on the instant facts. In the *General Instrument Corporation* case the bulk foil, paper, metal tabs, plastic insulating film, and cellophane tape, all entered directly into the assembly process (capacitors) right off the roll, and the cutting or severing

was performed on the bulk materials only for the purpose of separating the completed assembly from the supply source. However, in the instant case as well as in the *Dillingham* case the bulk materials never entered into the assembly process in the form in which they were exported from the United States.

On the basis of the evidence of record the court concludes that the district director committed no error in disallowing item 807.00 treatment for the nylon filaments at bar in view of the non-compliance with item 807.00 clause (a). The court does not consider that clauses (b) and (c) of item 807.00 pose issues for decision. These actions must be dismissed.

Judgment will be entered accordingly.