**ZWICKER KNITTING MILLS**

v.

**UNITED STATES.**

**C.D. 4786; Court No. 75-12-03110.**

United States Customs Court.

Feb. 1, 1979.

The acrylic gloves were classified under item 704.85 of the Tariff Schedules of the United States [TSUS] as unornamented knit gloves of man-made fibers, and assessed at 25 cents per pound plus 32.5 percent ad valorem. The wool gloves were classified under item 704.65, TSUS, as modified, as wool gloves valued over $4 per dozen pairs, and assessed at 37.5 cents per pound plus 18.5 percent ad valorem. Duty was assessed on both types of gloves under item 807.00, TSUS, as amended, upon the full appraised value of the gloves less the cost or value of precut palms assembled with the knit glove shells in Haiti, which were fabricated components of the United States.

Plaintiff does not dispute the classification, but challenges the refusal of the customs officials to make an allowance for the cost or value of the knit glove shells under item 807.00, TSUS.

Item 807.00, as amended by Public Laws 89–241 and 89–806, pursuant to which the allowance is claimed, provides:

> "Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting .. .. ...... ............... A duty upon the full value of the imported article, less the cost or value of such products of the United States . . ."

Barnes, Richardson & Colburn, Chicago, Ill. (Steven P. Sonnenberg and Robert E. Burke, Chicago, Ill., of counsel), for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., Bruce M. Mitchell and Bernard J. Babb, Washington, D. C., trial attys. for defendant.

RE, Chief Judge:

The question presented in this action pertains to the lawful customs duties to be assessed on certain acrylic and wool knit gloves exported from Haiti and entered at the port of Milwaukee, Wisconsin.

Plaintiff contends that the knit glove shells meet every requirement of item 807.-00, TSUS, and, therefore, are entitled to the prescribed duty allowance.

Defendant disputes this claim and maintains that plaintiff has failed to prove compliance with clauses (a), (b) and (c) of item 807.00, TSUS.

At the outset, reference may be made to the burden of proof that the plaintiff must bear in the present action. To prevail,

plaintiff must rebut the statutory presumption of correctness, which provides that, "[i]n any matter in the Customs Court: (a) The decision of the Secretary of the Treasury, or his delegate, is presumed to be correct. The burden of proving otherwise shall rest upon the party challenging a decision." . 28 U.S.C. § 2635. See discussion in *United States v. New York Merchandise Co.*, 435 F.2d 1315, 58 CCPA 53 (1970).

Under item 807.00, TSUS, the governing statutory provision, in order to be entitled to the claimed allowance, plaintiff must establish that:

a) the glove shells were exported in condition *ready for assembly without further fabrication* ;

b) the glove shells had not lost their physical identity by change in form, shape, or otherwise; and that

c) they *had not been advanced in value, or improved in condition abroad*, except by being assembled, and except by operations incidental to the assembly process such as cleaning, lubricating, and painting.

It is clear beyond doubt that the statutory allowance cannot be granted unless all three of the statutory requirements are satisfied. The statutory language is clear, and it is the duty of the courts to give effect to the legislative policy expressed in a valid statute.

In general terms, therefore, the question presented is whether plaintiff has rebutted the statutory presumption of correctness which attaches to the action of the customs officials in not granting the claimed allowance under item 807.00, TSUS. More specifically, it is whether plaintiff has succeeded in bearing its burden of proof by establishing that the knit glove shells were "assembled abroad" in compliance with the statutory requirements set forth in clauses (a), (b) and (c) of item 807.00, TSUS.

*Summary of Operations Performed Abroad*

The steps performed in plaintiff's plant in Wisconsin were described by two of plaintiff's witnesses: Mr. James Ertl, research director of Zwicker Knitting Mills, and Mr. Patrick Hughes, manufacturing manager of knitting accessories for Zwicker Knitting Mills.

The glove shells were knit in Wisconsin on knitting machines specially modified by plaintiff. The knitting machines could not complete or finish the fingertips of the glove shells. The knit glove shells have a yarn "float," or piece of yarn, that is a continuation of the knit glove shell that is used to close the fingertips in Haiti. The palms were die-cut on a clicker in plaintiff's factory from regular leather skins. The knit glove shells and the precut palms were then exported to Haiti. In one of the entries, a separate piece of yarn was exported with the knit glove shells and was used to close the fingertips.

The steps or operations performed in Haiti were described by one of plaintiff's witnesses, Mr. John R. Vandenberg, technical director of plaintiff's Haitian operation. Mr. Vandenberg testified that the merchandise arrived in Haiti in large shipping cartons. Upon arrival, the shipments were broken down. The knit glove shells, and in one of the entries, the separate piece of yarn, were moved to the department where the fingertips were finished or completed in what was called a "tipping" operation.

In the first step in the "tipping" operation, the yarn "floats," which are continuations of yarn between the open fingertip and base of the finger, were cut at the base of the finger. The glove finger was placed over a metal post large enough to fill a glove finger. The top row of knitted loops was unraveled to expose new, clear loops. A dulled needle was threaded with the yarn "float" and passed through the row of loops on one side of the fingertip. The needle and yarn were pulled through, the glove was turned on the post and the needle and yarn pulled through the loops on the other side of the fingertip. The top rows of stitches on each side were pulled together by stitches across the top of the fingertip about three-quarters of the way across before three tacking or stay stitches were

made. On the fourth tacking or stay stitch, the needle was brought down inside the finger and out. The yarn was then trimmed. This process was repeated for each of the five fingertips of the knitted glove shells.

When the "tipping" operation was completed, the gloves were turned inside out, and were run between rotating wire brushes. They were then turned rightside out and tumbled in a large dryer.

Thereafter, the knit glove shells were placed on wire forms and passed through a steam tunnel for shaping before being inspected for flaws. The gloves were then paired.

After the completion of the "tipping" operation and the subsequent processing, the precut palms were sewn on the gloves. After the palms were sewn onto the gloves, the completed gloves were again shaped and inspected before being ticketed, packed and exported to the United States.

Mr. Vandenberg demonstrated the various steps in the "tipping" operation on one fingertip of a sample glove shell that had been introduced into evidence.

Plaintiff introduced as exhibits a series of photographs illustrating the steps in the "tipping" operation. Also introduced into evidence were samples of the knit glove shells before "tipping," and as imported into the United States as completed gloves.

*Requirements of Clause (a) of Item 807.00*

In determining whether the knit glove shells comply with the requirements of clause (a) of item 807.00, TSUS, the initial question is whether they were "fabricated components" exported "in condition ready for assembly without further fabrication." More specifically, the question is whether the "tipping" operation performed in Haiti constituted a further fabrication. There can be no doubt that if there was "further fabrication," the knit glove shells do not meet the statutory requirements of clause (a) of item 807.00, TSUS.

Plaintiff claims that the knit glove shells were fabricated components in condition ready for assembly without further fabrication when exported. Plaintiff labels the "tipping" operation an assembly process whereby the yarn "float," or the separate piece of yarn, is "assembled" with the knit glove shell to form a knit glove.

Defendant, contending that the knit glove shells were not "ready for assembly" as required by clause (a), objects to plaintiff's studied reference to the "tipping" operation as an "assembly." Defendant contends that when exported, the glove shells were not completed "fabricated components." According to the defendant, the "tipping" operation was a further fabrication necessary to complete or finish the component material (knit glove shells) for assembly with the precut palms. Hence, the knit glove shells could not be *ready* "for assembly without further fabrication."

Although the statutory requirement is clear, there is no one, all-embracing definition of what steps or processes constitute "further fabrication" within the meaning of item 807.00, TSUS. Whether a particular process constitutes a "further fabrication" depends upon the facts of the particular case. In the recent case of *Miles v. United States*, 567 F.2d 979, 65 CCPA —— (1978), Judge Rich, writing for the Court of Customs and Patent Appeals appropriately noted that:

> "With regard to the requirement of clause (a), we agree with the appellee that 'In its present form, item 807.00 * * basically encompasses only American merchandise returned without substantial change or improvement.' Of course, whether substantial change or improvement has occurred is to be determined from the facts of each case." 567 F.2d at 982.

In *Miles*, the appellate court determined that the burning of 31 approximately 1–inch holes, two slots approximately 14 by 3 inches and one slot 10 by 2½ inches, in a 55–foot steel Z–beam to be assembled into a railroad boxcar was not such a substantial change as to constitute a further fabrication. The slots were burned into the Z–beams to allow insertion of draft keys at

each end, which fit the couplers to the yokes, and to allow the brake piping to pass through. The 31 holes were burned into the Z–beams to permit installation of wear plates to protect the Z–beams from damage and support plates to maintain additional parts that are attached to the Z–beams.

The appellate court recognized that, viewed in isolation, the operations performed on the Z–beams seemed to produce substantial changes. The court, however, determined that, in relation to the massive size of the steel Z–beams, the changes and improvements made were not so extensive as to constitute a "further fabrication":

> "[T]he components require their own appropriate techniques because they are *large* steel parts. Such parts must be rigidly secured if they are to withstand the stresses that they must as boxcar components. Thus, in perspective, burning the slots and holes of the aforestated dimensions in 55′ steel Z–beams to permit their assembly is not such substantial change as constitutes further fabrication." 567 F.2d at 983. (Emphasis in original.)

It was clear in *Miles* that the Z–beams were completed "fabricated components." The question presented pertained solely to the steps or processes performed on admittedly finished components. In reaching its determination that the processes did not constitute a further fabrication, the appellate court looked not only to the actual steps performed, but also considered the cost and amount of labor expended. It expressly noted that the "component Z–beams [did] not require *significant* labor to enable them to be incorporated into boxcars." 567 F.2d at 982. (Emphasis in original.) The court stated that "[t]he evidence established that the total labor in Mexico required a maximum of 104 minutes at a cost of twelve dollars (the value of a pair of Z–beams being alleged as $395), or only 3% of the value of a beam." *Id.*

Not all operations to which an article may be subjected for assembly will necessarily preclude qualification for allowance under item 807.00, TSUS. Plaintiff, citing *General Instrument Corp. v. United States*, 480 F.2d 1402, 60 CCPA 178 (1973), urges that the "tipping" operation is an example of an operation constituting an assembly process within the purview of clause (a). The *General Instrument* case, however, is readily distinguishable. In that case, anode foil, cathode foil, paper, metal tabs, plastic insulating film and cellophane tape were exported from the United States to Taiwan for assembly into electrolytic capacitors. All of the components were exported in rolls of the width necessary for assembly except the anode foil. The only operation to which these items were subjected for the actual assembly process was cutting some of the components to length, and, in the case of the anode foil, trimming the edges to the proper width. To the same effect, *see United States v. Texas Instruments Inc.*, 545 F.2d 739, 64 CCPA 24 (1976) (silicon slices); *General Instrument Corp. v. United States*, 499 F.2d 1318, 61 CCPA 86 (1974) (television deflection yokes) and *General Instrument Corp. v. United States*, 462 F.2d 1156, 59 CCPA 171 (1972) (transistors).

In the present action, the yarn "float" is cut from the knit glove shell, and is used in the "tipping" operation. It is not the cutting of the yarn "float," but the completion of the fingertips by the "tipping" operation, that is crucial as to whether there was an "assembly" or a "further fabrication."

In *E. Dillingham, Inc. v. United States*, 470 F.2d 629, 60 CCPA 39 (1972), the opening, oiling and carding of bulk fibers, which were assembled with fabric to produce papermakers' felts, constituted a further fabrication of the fibers. The court noted that "[w]hat was exported here was a fiber mass in bulk on which much further labor was expended to put it into the condition required to enable it to be needled into the fabric." 470 F.2d at 633, 60 CCPA at 44.

Similarly, in *The Rubberset Co. v. United States*, 73 Cust.Ct. 107, C.D. 4560, 383 F.Supp. 1403 (1974), nylon filaments of American origin were shipped in bulk to Canada where they underwent various sorting and selection processes prior to their assembly into paintbrush knots and paint-

brushes. The court held that this interim processing, without which the filaments as exported would not have been capable of being assembled, constituted a "further fabrication" within the meaning of clause (a) of item 807.00.

The "tipping" operation in the present case constitutes an even clearer example of "further fabrication." That "to fabricate" means to construct or manufacture may be gleaned from any standard dictionary. The "tipping" operation is nothing less than the completion or finishing of the manufacturing process that was begun by the knitting machine in the Wisconsin plant. The testimony of plaintiff's director of the Haiti operation, Mr. John R. Vandenberg, makes this clear. The yarn "float" that is used to close the fingertips is, in all but one case, an extension of the very same yarn used to knit the glove shells, and is cut from the knit component only moments before it is used to make the fingertips. In one of the entries, a separate piece of yarn is exported with the knit glove shell to be used in the "tipping" procedure. This yarn is the same type of yarn used to knit the glove shells, and, according to Mr. Vandenberg, comes from yarn ends from the knitting of other gloves.

The yarn "float" is not used simply to sew the fingertips closed. Rather, it is passed through the top row of loops left by the machine knitting process on each side, and is passed through the top row of stitches about three-quarters of the way across before three tacking or stay stitches are taken across the top of the tip. In relation to the glove shell, this procedure is substantial, and, regardless of the word or label selected to describe it, is in fact an indispensable completion or finishing of the knitting process.

This conclusion is fully supported by the testimony on cross-examination of Mr. Patrick Hughes, plaintiff's manufacturing manager of knitting accessories. Mr. Hughes testified that the knitting machines could knit a complete glove shell with fingertips closed on certain glove styles, but could not complete the styles of gloves that are the subject of this action. Other than programming the knitting machines for the pattern to be knit, and supplying the machines with yarn, the only hand labor required in the manufacturing process in the United States was cutting and separating the knit glove shells as they came off the knitting machines. When the knit glove shells were exported from the United States, they were knit only to the extent that the knitting machines were capable of knitting on these particular styles. They were not in fact completely knit. It was left to the intensive labor, by hand, in Haiti to finish the fabrication process commenced in the United States.

The "tipping" operation is clearly a "further fabrication" because it actually *constructs* a portion of the glove that did not exist before, namely the fingertips. As described by Mr. Vandenberg, it is a manufacturing, construction or fabrication operation. Unlike the *General Instrument* cases, the "tipping" operation performed on the knit glove shells does not "assemble" or put together two components that are already made and completed. Rather, it completes one single component by creating something that did not exist before, that is, a fingertip, an indispensable part of the glove shell.

The court does not agree that the use of the same material (yarn) that makes up the component (knit shell) to construct a further part or portion of that component is a mere "assembly." Before the "tipping" operation, the glove shell was incomplete *as a fabricated component.* It is only after the fingertips are manufactured, constructed or fabricated, with a continuation of the very yarn used to knit the glove shell, that the glove shell becomes a fabricated component.

Unlike the operations performed on the Z–beams in *Miles v. United States,* 567 F.2d 979, 65 CCPA —— (1978), the "tipping" operation on the knit glove shells required a significant amount of labor. In the *Miles* case, the operations performed abroad on the 55–foot steel Z–beams required 104 minutes of labor at a cost of $12, or about 3 percent of the value of the beam. In con-

trast, by plaintiff's own admission, the so-called "tipping" operation required eleven separate steps.

Mr. Vandenberg testified that it took approximately 30 seconds to "close" one fingertip, or 2½ minutes to close all the fingertips of one glove shell. However, in his demonstration of the "tipping" operation, Mr. Vandenberg required approximately 4 minutes to complete one fingertip. Even allowing for the one brief interruption, and the fact that Mr. Vandenberg was describing the process as he performed it, the discrepancy is substantial. Assuming, however, that the estimate of 30 seconds per finger, or 2½ minutes per glove, is correct, it is important to note that Mr. Vandenberg also testified that the knitting machines required approximately 5 minutes to knit one glove shell. The "tipping" operation, therefore, required half as much time as the knitting of the entire glove shell.

On the question of the cost of the "tipping" operation, the testimony of Mr. Anderson, plaintiff's treasurer and comptroller, is also enlightening. Although it is unclear whether Mr. Anderson was referring to the cost of performing the "tipping" operation in Wisconsin or in Haiti, it is nevertheless clear that the cost of performing the "tipping" operation in Haiti was a *significant* portion of the total cost of manufacturing the gloves. On cross-examination, in answer to the question "if it cost more money to close the fingertips on the pair of gloves in front of you than it cost to manufacture the knitted glove shell on the machine in Wisconsin," Mr. Anderson responded, "yes, it would." Mr. Anderson agreed that "the cost of the knitting operation of the entire glove shell is less than the cost of the operation of closing the fingers."

The evidence shows that the "tipping" operation must be completed as the next processing step after the knitting of the glove shell since without "tipping" the yarn would unravel during the brushing and steaming steps. As in the case of *The Rubberset Co. v. United States,* 73 Cust.Ct. 107, 383 F.Supp. 1403 (1974), "without this essential processing the [material] as ex-ported would not be capable of being assembled." 73 Cust.Ct. at 111, 383 F.Supp. at 1405. Furthermore, when viewed in relation to the entire manufacturing process of the gloves, the "tipping" operation, in the words of the *Miles* case, constitutes a "substantial change or improvement." 567 F.2d at 982.

Plaintiff, nevertheless, asserts that the "tipping" operation is more appropriately viewed as an act of assembly rather than as a "further fabrication."

█ It is common knowledge that *to assemble* means to fit or join components or parts together. *Assembly,* in the present context, signifies the fitting or joining together of "finished" manufactured or fabricated parts or components. *Webster's Third New International Dictionary* (1966) defines an "assembly" to be:

> "5a: the act or process of building up a complete unit (as a motor vehicle) using parts already in themselves finished manufactured products  .   .   .."

The word *assemble* is defined in *Webster's Third New International Dictionary* (1966) as follows:

> "2: to bring together: as—a: to put or join together usu. in an orderly way with logical selection or sequence  .   .   . b: to fit together various parts of so as to make into an operative whole [*sic*] .   .   .."

The judicial interpretations of the word "assemble" closely follow the lexicographic definition, and acknowledge its importance. In *C. J. Tower & Sons of Buffalo, Inc. v. United States,* 62 Cust.Ct. 643, 304 F.Supp. 1187 (1969), the court noted that:

> "[T]he framers of item 807.00 have used one form or another of the term 'assemble' with the same understanding of its scope as that imparted by contemporary lexicographers, namely, that the term is used to describe the joining or coming together of *solids.*" (Emphasis in original.) 62 Cust.Ct. at 647, 304 F.Supp. at 1190.

In the case of *J. E. Bernard & Co. v. United States,* 420 F.2d 1403, 57 CCPA 52 (1970),

the Court of Customs and Patent Appeals considered the meaning of the word "assembly" as used in paragraph 368(c) of the Tariff Act of 1930. Despite the differing context, the court nevertheless quoted the lexicographic definitions of "assembly" and "assemble" and determined that "an assembly . . . results when two or more existing parts or pieces are joined together . . . ." 420 F.2d at 1407, 57 CCPA at 58.

The Customs Regulations define assembly in terms of articles assembled abroad with United States components in section 10.-12(b):

"(b) *Assembly.* 'Assembly' means the fitting or joining together of fabricated components." 19 C.F.R. § 10.12(b).

It is apparent that the judicial and lexicographic definitions of "assembly," as well as the Customs Regulations, envision an assembly which requires finished manufactured or fabricated components which are "joined" together to form an article. Clearly, "assembly" does not include the manufacture, production or fabrication of the essential parts to be used in the assembly process.

In addition to the guidance provided by the decided cases, it is necessary constantly to recall the legislative policy expressed in the governing statute. The congressional allowance permitted by the statute is limited to products of the United States *"assembled abroad."* The statutory language does not speak of "fabricated components," *complete* or *incomplete, finished* or *unfinished.* Such an interpretation would clearly do violence to clause (a) of item 807.00, TSUS, which expressly states *"ready* for assembly *without* further fabrication."

It is plaintiff's claim that the knit glove shell was a fabricated component when exported since no further knitting was performed after the machine had knit the glove shell. Plaintiff supports its assertion that the "tipping" operation is an assembly by drawing an analogy between the act of closing the fingertip with a length of yarn and a needle, and the sewing together of precut pieces of fabric, which is clearly an assembly.

Plaintiff places primary reliance on the case of *Baylis Brothers Co. v. United States,* 64 Cust.Ct. 256, C.D. 3987 (1970), *aff'd,* 451 F.2d 643, 59 CCPA 9 (1971). In the *Baylis Brothers* case, precut dress fronts were exported to be "smocked" and then returned. The dress fronts were fabricated in the United States by cutting fabric to a predetermined size and shape and stenciling a pattern of dots onto the fabric. The smocking was performed abroad by sewing thread through the stenciled dots to obtain shirrs or gatherings of the fabric. The smocking did not involve sewing the precut dress fronts onto other pieces of fabric, but rather the sewing gathered the fabric of the dress front to itself to create the shirrs. The smocked dress fronts were imported to be assembled into children's dresses in the United States. The court held this smocking operation to be an assembly of the dress front with the thread. In its reply brief, plaintiff asserts that the only "difference between the fabric and thread in the *Baylis* case and the fabric and yarn in this case, insofar as item 807.00, TSUS, is concerned is that in this matter the yarn must be cut prior to the sewing process."

The court does not agree because there is another, more important distinction between the *Baylis Brothers* case and the case at bar. In *Baylis Brothers* the fabric or component was completely fabricated. It not only required no cutting, but more important, it also required no further weaving prior to assembly. The operation merely sewed the fabric in such a way as to create shirrs or "gathers." The dress fronts were completely fabricated before the "smocking" took place, and no new portion of the dress fronts was created by that operation. In contrast, the knit glove shells were not completely fabricated when exported from the United States. The "tipping" operation, rather than being an assembly process by sewing, was a further fabrication by a finishing or completion of the knitting that the knitting machine could not complete on these particular styles of gloves.

The knit glove shell becomes a *fabricated component* "in condition ready for assem-

bly" only after the fingertips have been constructed. It is only after this manufacturing operation takes place that the glove shells become a fabricated component like the precut dress fronts in the *Baylis Brothers* case.

Furthermore, it is futile to stress the *Baylis Brothers* case as a controlling precedent when it merely involved the simple joining of thread to dress fronts following a predetermined pattern. Judge Baldwin, writing for the Court of Customs and Patent Appeals in the *Baylis* case, dismissed the issue of whether the precut dress fronts met the requirements of clause (a) of item 807.00, TSUS, by finding that "the smocking operation is well within the common meaning of the term 'assembly,' since the operation merely consists in joining the two components together according to the stenciled designs." 451 F.2d at 645, 59 CCPA at 11. The issue that occupied the court's attention in *Baylis Brothers* was whether the components failed to meet the requirements of clause (b) of item 807.00, TSUS, by having changed in form, shape, or otherwise to such an extent as to have lost their physical identity.

The "tipping" operation is the completion or fabrication of the single major component of the knit gloves. Since the knit glove shells were not "finished manufactured products," they were not ready for "assembly" in the common or dictionary meaning of the word. Viewed in a statutory setting for purposes of the item 807.00, TSUS, allowance, they were not *fabricated* components *ready* for assembly *without* further fabrication. As stated in the *General Instrument Corp.* case, "classification under item 807.00 depends upon the relationship of the disputed element to the whole." 480 F.2d at 1405–06, 60 CCPA at 182. Viewing the "tipping" operation in relation to the entire manufacturing process, it clearly constitutes a "further fabrication" of the knit glove shells and not an assembly of fabricated components.

That the "tipping" operation is a "further fabrication," and not an "assembly," may be demonstrated also by a comparison of the "tipping" operation to the process of sewing the precut palms onto the knit glove shells. The precut palms had holes punched in them where they were to be sewn onto the glove shells. The precut palms required no further steps before assembly or joining with the glove shells. This operation was clearly an assembly of the type performed in the *Baylis Brothers* case. The Customs Service recognized sewing of the precut palms onto the completed knit glove shells as an act of .assembly, and the allowance permitted by item 807.00, TSUS, was granted.

■ Nor can the "tipping" operation be construed to be a subassembly operation prior to final assembly with the precut palms. It is well recognized in customs law that an article is not precluded from item 807.00 allowance solely because it is subjected to a subassembly process prior to assembly. *Miles v. United States*, 567 F.2d 979, 65 CCPA —— (1978); *General Instrument Corp. v. United States*, 480 F.2d 1402, 60 CCPA 178 (1973). However, the subassembly process must itself be an assembly and not a further fabrication. For the same reasons that the "tipping" operation could not be an assembly process, it cannot be a subassembly process.

*Requirements of Clause (b) of Item 807.-00*

■ Although defendant, in its answer, denied plaintiff's allegation that the knit glove shells did not lose their physical identity by change in form, shape or otherwise, it did not address this issue at the trial, or in its brief. The court agrees with plaintiff that, for purposes of clause (b) of item 807.00, TSUS, the knit glove shells had not "lost their physical identity . . . by change in form, shape, or otherwise" by reason of the "tipping" operation.

■ Physical changes in the article do not necessarily lead to a loss of "physical identity" within the meaning of clause (b) of item 807.00, TSUS. In the case of *United States v. Baylis Brothers Co.*, 451 F.2d 643, 646, 59 CCPA 9, 12 (1971), the Court of Customs and Patent Appeals stated that:

"The legislative history makes it equally apparent, however, that Congress did not intend to exclude articles from item 807.00 merely because the American components had undergone some change of form or shape. The test specified in item 807.00 is whether the components have been changed in form, shape, or otherwise to such an extent that they have lost their *physical identity* in the assembled article. The term 'physical identity' was used to exclude from item 807.00 those assembled articles whose American components are 'chemical products, food ingredients, liquids, gases, powders,' and the like." (Footnote omitted; emphasis in original.)

This physical identity test has been reiterated in two subsequent cases: *General Instrument Corp. v. United States*, 499 F.2d 1318, 61 CCPA 86 (1974); *General Instrument Corp. v. United States*, 480 F.2d 1402, 60 CCPA 178 (1973).

The "tipping" operation, although working a change in the form or shape of the knit glove shell, did not change the glove shells to such an extent that they lost their physical identity. The knit glove shells did not lose their physical identity by the completion of the fingertips. This may be seen from the exhibits submitted of the knit glove shells, which show the state of the glove shells before and after the "tipping" operation, and from various photographs which illustrate the "tipping" operation.

### Requirements of Clause (c) of Item 807.00

In order to qualify for the claimed item 807.00, TSUS, allowance, clause (c) requires that the articles "have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting." In the present action, the articles exported from the United States were clearly "advanced in value or improved in condition" by the various operations performed in Haiti.

For the reasons discussed under clause (a), the "tipping" of the glove shells was a "further fabrication," and not an act of assembly. For the reasons that follow, it was not an operation incidental to the assembly of the precut palms to the knit glove shells.

Any doubt as to the type of operation that Congress intended to be considered "incidental to the assembly process" is resolved by the applicable legislative history in H.R.Rep. No. 342, 89th Cong., 1st Sess. 48–49 (1965), accompanying H.R. 7969 (subsequently enacted as the Tariff Schedules Technical Amendments Act of 1965, Pub.L. 89–241), which stated that:

"It appears that under the language of item 807.00 minor operations such as painting incidental to assembly abroad may be precluded, and that in certain respects the item is ambiguous, with the result that it imposes undue administrative burdens on customs officers.

Section 72 of the bill would amend item 807.00 so that it would apply to articles assembled abroad in whole or in part of fabricated components, the product of the United States, which . . . (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting.

\* \* \* \* \* \*

The amended item 807.00 would specifically permit the U. S. component to be advanced or improved '*by operations incidental to the assembly process such as cleaning, lubricating, and painting.*' It is common practice in assembling mechanical components to perform certain incidental operations which cannot always be provided for in advance. For example, in fitting the parts of a machine together, it may be necessary to remove rust; to remove grease, paint, or other preservative coatings; to file off or otherwise remove small amounts of excess material; to add lubricants; or to paint or apply other preservative coatings. It may also be necessary to test and adjust the components. Such operations, *if of a minor nature incidental to the assembly process,*

whether done before, during, or after assembly, would be permitted even though they result in an advance in value of the U.S. components in the article assembled abroad." (Emphasis added.)

The language of clause (c) states categorically that for the statutory allowance to be granted, the United States components must "have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process." To facilitate interpretation and to remove doubt as to the operations that were deemed "incidental to the assembly process," the statute gave as specific examples operations "such as *cleaning, lubricating*, and *painting*." (Emphasis added.)

Completing the fingertips of the knit glove shells is clearly not *ejusdem generis* with "cleaning, lubricating, and painting." Certainly, it is not of a "minor nature" as contemplated by the House Report.

In the *Miles* case, the burning of holes and slots in the steel Z-beams was found to be a change of a minor or insubstantial nature *in relation to the massive, 55–foot steel Z–beam*. In contrast, the "tipping" operation on the knit glove shells cannot be considered as *incidental*. The testimony of plaintiff's witnesses, showed the complexity and importance of the "tipping" operation in relation to the entire fabrication or manufacturing process. The "tipping" operation was a critical step prior to assembly of the precut palms with the knit glove shells. The fingertips had to be closed before the glove shells were brushed, steamed and shaped. Furthermore, the "tipping" operation consisted of eleven steps requiring approximately half as much time to complete as the knitting machine required to knit the entire glove shell. Moreover, the cost of completing the fingertips constituted a substantial part of the cost of the completed glove.

In *United States v. Texas Instruments Inc.*, 545 F.2d 739, 64 CCPA 24 (1976), the scoring and breaking of a silicon slice along provided "streets," to separate the individual transistor areas that had been commonly created on the slice, was determined to be an operation incidental to the assembly process. Basing its decision on the *General Instrument* cases discussed under clause (a), the appellate court noted that "[t]he transistor chips themselves are unchanged after the scoring and breaking operation; they are merely separated, as the wire and foil were separated from the supply spools in the prior [*General Instrument*] cases." 545 F.2d at 743–44, 64 CCPA at 30.

Unlike the transistor chips in the *Texas Instruments* case, the knit glove shells in this action are substantially advanced in value or improved in condition after the "tipping" operation. That operation created something new that did not exist before, *viz.* fingertips for the glove shell, thereby completing the knit glove shell component. Unlike the scoring and breaking of the silicon slice in the *Texas Instruments* case, the "tipping" operation is not "incidental to the assembly process."

The conclusion that the "tipping" operation is not an operation "incidental to the assembly process" is supported by comparison of the "tipping" operation to the brushing, tumbling, steaming and shaping steps that the glove shells underwent prior to assembly with the precut palms. The brushing operation consisted of turning the gloves inside out and passing them between two rotating wire brushes. After brushing, the glove shells were placed in a large dryer for tumbling. The glove shells were next placed on wire forms and passed through a steam tunnel for shaping. These operations are of the type of *minor* operations contemplated by Congress, and are *incidental* to the assembly of the glove shell with the precut palms. They leave the glove shell essentially unchanged. Without these steps, the gloves, when assembled, would still be wearable. In the absence of the "tipping" operation, the gloves would be incomplete, unfinished and not usable.

In order to prevail in this action, plaintiff was required to prove that the knit glove shells, and the separate yarn float in one entry, "were exported in condition ready for assembly without further fabrication"

and had "not lost their physical identity in such articles by change in form, shape, or otherwise." Plaintiff was also required to establish that the knit glove shells had "not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting." Plaintiff has failed to bear all three elements of its burden of proof.

Upon all the evidence of record, it is the determination of the court that the plaintiff, notwithstanding the able presentation of its case, has not succeeded in rebutting the presumption of correctness as to clauses (a) and (c) of item 807.00, TSUS. Having failed to establish compliance with the requirements stated in clauses (a) and (c), plaintiff is not entitled to the duty allowance claimed under item 807.00 of the tariff schedules.

Judgment will be entered accordingly.